1  SHENOI KOES LLP
   Allan A. Shenoi [CSB #122566]
2  Daniel J. Koes [CSB #192513]
   175 South Lake Avenue, Suite 202
3  Pasadena, California 91101
   Telephone:  626-792-2300
4  Facsimile:   626-792-2311

5  Attorneys for Plaintiffs

6

7              **UNITED STATES DISTRICT COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9

10 DR. MANOHAR SHINDE, an Individual;          ) **CASE NO.:**
   RAMESH BHUTADA, Individually, and           ) **EDCV 13-00363 JGB (SPx)**
11 as Trustee of the BHUTADA FAMILY            )
   FOUNDATION; BHUTADA FAMILY                  )
12 FOUNDATION; SIVA TAYI, an                   )
   Individual; DR. BALA BHAT, an               ) **THIRD AMENDED**
13 Individual; DR. NEIL CARMAN, an             ) **COMPLAINT FOR:**
14 Individual; and HITEN DALAL, an             )
   Individual,                                 )    1. **Fraud & Deceit**
15                                             )    2. **Civil Conspiracy**
                                               )    3. **RICO**
16                                             )    4. **RICO Conspiracy**
            Plaintiffs,                        )    5. **Unfair Business Practices**
17 vs.                                         )
18                                             )
   NITHYANANDA FOUNDATION, an                  ) **DEMAND FOR JURY TRIAL**
19 Oklahoma Corporation; LIFE BLISS           )
20 FOUNDATION, INC., a California              )
   Corporation; NITHYANANDA                    )
21 DHYANAPEETAM TEMPLE &                       )
   CULTURAL CENTER, a California               )
22 Corporation; DHYANAPEETAM                   )
23 CHARITABLE TRUST, a business entity        )
   form unknown; MR. NITHYANANDA, an          )
24 Individual (aka Swami); SIVA                )
25 VALLABHANENI, an Individual; GOPAL         )
   SHEELUM, an Individual; and DOES 1          )
26                                             )
27 through 10.                                 )
                                               )
28                                             )
            Defendants.                        )

COMES NOW Plaintiffs DR. MANOHAR SHINDE, RAMESH BHUTADA, Individually and as Trustee of and for named Plaintiff BHUTADA FAMILY FOUNDATION; SIVA TAYI; DR. BALA BHAT; DR. NEIL CARMAN; and HITEN DALAL complain of Defendants NITHYANANDA FOUNDATION; LIFE BLISS FOUNDATION, INC.; NITHYANANDA DHYANAPEETAM TEMPLE & CULTURAL CENTER; DHYANAPEETAM CHARITABLE TRUST; Mr. NITHYANANDA (aka "Swami"); SIVA VALLABHANENI; GOPAL SHEELUM; and DOES 1 through 10, demand a trial by jury, and on information and belief allege as follows:

## JURISDICTION

1.     The jurisdiction of this Court is founded on 28 U.S.C. section 1331 because this action arises under 26 U.S.C. section 501(c) ("Section 501(c)") and 18 U.S.C. section 1961 et seq.

## VENUE

2.     Venue is proper in this Court because (1) a substantial portion of the events and omissions giving rise to the claims occurred in San Bernardino and Los Angeles Counties; (2) three of the business entities defined herein as NITHYANANDA ORGANIZATION maintained their principal place of business in San Bernardino County; and (3) there is personal jurisdiction over NITHYANANDA

ORGANIZATION and the Individual Defendants because they regularly conducted activities in San Bernardino and Los Angeles Counties.

## PLAINTIFFS

3.     Plaintiff DR. MANOHAR SHINDE ("SHINDE") is an individual and a resident in the City of Northridge, County of Los Angeles, State of California.

4.     Plaintiff RAMESH BHUTADA ("BHUTADA") is an individual, and a resident of the city of Houston, in Harris County, Texas.

5.     BHUTADA is also the trustee of and is suing for and on behalf of the BHUTADA FAMILY FOUNDATION, a separate Plaintiff, which is a corporation established under the laws of the State of Texas. Both Mr. Bhutada and Bhutada Family Foundation are referred to collectively as "BHUTADA."

6.     Plaintiff SIVA TAYI ("TAYI") is an individual and a resident in the City of Houston, County of Harris, State of Texas.

7.     Plaintiff DR. BALA BHAT ("BHAT") is an individual and a resident in the City and County of San Luis Obispo, State of California.

8.     Plaintiff DR. NEIL CARMAN ("CARMAN") is an individual and a resident in the City of Austin, County of Hays, State of Texas.

9.     Plaintiff HITEN DALAL ("DALAL") is an individual and a resident in the City of Cerritos, County of Los Angeles, State of California.

///

# INDIVIDUAL DEFENDANTS

10.     Defendant Mr. NITHYANANDA ("Mr. NITHYANANDA") whose real name is Rajasekaran, and who is also known as Sri Nithyananda Swami or Paramahamsa Nithyananda, is an individual and NITHYANANDA ORGANIZATION'S Leader. He was also one of the incorporators of Defendant NITHYANANDA FOUNDATION.

11.     Defendant SIVA VALLABHANENI ("SIVA"), also known as Siva Valcabhaneni, Swami Sachitannanda, Shiva, Sachit or Sachit Swami is an individual and a resident in the City of Rancho Cucamonga, County of San Bernardino, State of California. In 2004, SIVA was one of Defendant NITHYANANDA FOUNDATION's co-founders--along with Mr. NITHYANANDA and SIVA's wife. A California Secretary of State filing identified SIVA's business address as 928 Huntington Drive, Duarte, California 91010. On information and belief, it is alleged that SIVA's current business address is 9720 Central Avenue, Montclair, California 91763. SIVA has sworn in a 2010 lawsuit he commenced in the State of Washington that he is a resident of California.

12.     Defendant GOPAL SHEELUM ("GOPAL") also known as Bhaktananda Swami, Bhakta Swami, Swami Bhakta or Bhakta is an individual and a resident in the City of Duarte, County of Los Angeles, State of California. GOPAL was one of the original Directors of Defendant NITHYANANDA FOUNDATION in 2004, The

California Secretary of State's records identify GOPAL's business address as 928 Huntington Drive, Duarte, California 91010.  On information and belief, it is alleged that GOPAL's current business address is 9720 Central Avenue, Montclair, California 91763.  GOPAL has sworn in a 2010 lawsuit he commenced in the State of Washington that he is a resident of California.

13.    Defendants Mr. NITHYANANDA, SIVA, and, GOPAL, as well as the unnamed individual DOE Defendants, are ostensible managing agents with apparent full control over NITHYANANDA ORGANIZATION and will be collectively referred to as the "Individual Defendants."

### THE  ENTITIES WHICH PLAINTIFFS DEFINE AS "NITHYANANDA ORGANIZATION"

14.    Defendant   NITHYANANDA   FOUNDATION   ("NITHYANANDA FOUNDATION") is an Oklahoma corporation, which at all times relevant has been doing--and continues to do--business at their principal place of business within the jurisdiction of this Court at 5271 San Bernardino Street, Montclair, California 91763 (the "Montclair Property").

15.    On information and belief, Plaintiffs allege it was incorporated in 2004 with Individual Defendant Mr. NITHYANANDA as its President and SIVA was one of its incorporators.   NITHYANANANDA FOUNDATION's original directors were the three named Individual Defendants.

16.    On March 29, 2004 both Mr. NITHYANANDA and SIVA signed an Amendment to the purpose of this corporation in which they both committed to not carry on any activities not permitted to be carried on by an organization exempt from Federal income tax under section 501(3)(3) of the Internal Revenue Code. The IRS granted this corporation's application for tax exemption retroactive effective March 2, 2004.

17.    At all times relevant herein, Defendant NITHYANANDA FOUNDATION held itself out--and holds itself out--as an American tax-exempt, nonprofit corporation purportedly in compliance with Section 501(c).

18.    On information and belief, it is alleged that Defendant LIFE BLISS FOUNDATION, INC. ("LIFE BLISS") is a California corporation which was incorporated on or about January 26, 2006, which at all times relevant has been doing--and continues to do--business within the jurisdiction of this Court at the Montclair Property, which is its principal place of business.  Defendant LIFE BLISS held itself out as--and holds itself out as--an American tax-exempt, nonprofit corporation purportedly in compliance with Section 501(c).

19.    On information and belief, it is alleged that Defendant NITHYANANDA DHYANAPEETAM TEMPLE & CULTURAL CENTER ("NDTCC") is a California corporation incorporated on January 8, 2007, which at all times relevant has been doing--and continues to do--business within the jurisdiction of this Court at the

Montclair Property, which is its principal place of business.  Defendant NDTCC held itself out as--and holds itself out as--an American tax-exempt, nonprofit corporation purportedly in compliance with Section 501(c).

20.     On information and belief, it is alleged that Defendant DHYANAPEETAM CHARITABLE TRUST also known as Nithyananda Dhyanapeetam ("the TRUST") is a foreign business entity, form unknown, to whom the other Defendants instructed Plaintiffs to make their checks payable from time to time.

21.     Defendants NITHYANADA FOUNDATION, LIFE BLISS, NDTCC and the TRUST, and the other twenty entities identified in ¶ 33 are collectively referred to as "NITHYANADA ORGANIZATION" because, for the reasons set out in ¶¶ 22 - 42: (1) each of these entities was under joint common control by the three Individual Defendants, (2) all funds of each of these entities were pooled together under the common control by the three Individual Defendants, (3) each entity was but an instrumentality or conduit of the other entities, (3) the Individual Defendants and these entities themselves disregarded any separate nature of the entities and themselves operated all of them as "the organization", (4) the three Individual Defendants have routinely engaged in asset-stripping, moving assets between the entities for their own benefit, and encumbering entities with liabilities to other entities in the ORGANIZATION in order to avoid creditors, and (5) disregard of their separateness is necessary to prevent an injustice upon Plaintiffs and Defendants'

creditors. Simply put, all of these entities (not just the four entities named as Defendants) were the alter egos of Mr. NITHYANANDA, SIVA and GOPAL.

## DEFENDANTS' ALTER EGO ENTITIES

## UNITY OF CONTROL PRONG

22.    Mr. NITHYANANDA and the two other Individual Defendants SIVA and GOPAL controlled the four entities names as Defendants and all of the twenty entities listed in paragraph 33 below that Plaintiffs have defined as "NITHYANANDA ORGANIZATION" or the "ORGANIZATION," by their joint management and total control by Mr. NITHYANANDA, SIVA and GOPAL, interlocking boards of directors, many operating from the same location or using the same telephone number or having the same person serve as CFO of several of these entities, having local Coordinators represent all of these entities, sometimes formally listing each other as "dbas," comingling all revenues of these entities together under the total control of Mr. NITHYANANDA, SIVA and GOPAL, freely moving funds between these instrumentalities, making loans from one entity to another to encumber one facing liability, national joint fundraising, and a national joint donor list.

23. At various times between the spring of 2006 to December 2009, both TAYI and BHUTADA, who reside in Houston, were informed by Mr. Prakash Morolia, who was the  Houston Coordinator of all of Mr. NITHYANANDA's entities in the U.S., that the four entitles named as Defendants and the following entities--as they were

created through the years--were treated internally by Mr. NITHYANANDA, SIVA, GOPAL and the various Coordinators in the various cities as one and the same, conducted common fund raising as one entity, all revenues to any of these entities were pooled, and 100% of the revenues and expenditures and all policy-making was controlled by Mr. NITHYANANDA through SIVA and GOPAL:

1. Nithyananda Sacred Arts; Sacred Arts;

2. Nithyananda Youth Foundation;

3. Nithyananda Temple Arts, LLC

4. Nithyanada Foundation in Ohio

5. Nithyananada Dhyanapeetam of Columbus

6. Nithyananda Dhyanapeetam, LLC

7. Nithyananada Dhyanapeetam of New York

8. Nithyananda Dhyanapeetam of St. Louis

9. Nithyananda Dhyanapeetam of Oklahoma

10. Nithyananada Dhyanapeetam of North Carolina

11. Nithyananda Dhyanapeetam of Houston

12. Nithyananda Dhyanapeetam of Seattle

13. Nithyananda Dhynapeetam of San Jose

14. Nithyananda Dhynapeetam of Phoenix

15. Nithyananda Yoga Foundation

{00037480.DOC}

16. Nithyananda Anna Mandir

24.     Prakash Morolia, the ORGANIZATION's Houston Coordinator appointed by SIVA and GOPAL with Mr. NITHYANANDA's authority in 2006, told BHUTADA and TAYI that he witnessed the three Individual Defendants engaged in common fundraising for all of these entities, asked to create one national donor list for all these entities, and exercised 100% control over all revenues of each of these entities without any regard for any corporate separateness of any entity or the lack of Mr. NITHYANANDA or SIVA or GOPAL being on any Board or having any official position or title. *See* Exhibits C and D.  Mr. Morolia told BHUTADA and TAYI that he observed no differentiation in terms of who made the decisions or policy or who controlled all of the finances for these above identified entities: it was Mr. NITHYANANDA, SIVA and GOPAL.

25.     At various times from 2006 through 2009, Mr. NITHYANANDA, SIVA and GOPAL and other agents of the Defendants such as GOPAL's wife Mrs. Jyothi Sheelum, Mr. Sreraman Narasiman, Mr. Balaji Santharam and Mr. Raj Krishnan who were local Coordinators for these Defendants, represented in meetings at which SHINDE was present that Nithyananda Sacred Arts, Ananda Galleria, Nithyananda Youth Foundation, Life Bliss Galleria, Nithyananda Temple Arts, LLC, Nithyananda Foundation of Ohio, Nithyananda Dhyanapeetam LLC,  Nithyananda Anna Mandir, Nithyananda Ashrams, and all of the many Nithyananda Dhyanapeetam locations that

were gradually being opened around the country such as Nithyananda Dhynapeetam of St. Louis, Nithyananda Dhynapeetam of Phoenix, Nithyananda Dhynapeetam of Seattle, Nithyananda Dhynapeetam of New York, Nithyananda Dhynapeetam of Columbus, Nithyananda Dhynapeetam of Houston, Nithyananda Dhynapeetam of North Carolina, were either "dbas" for, or part and parcel of, one and the same entity, all funds collected by any of these entities were pooled and subject 100% to the control and direction of Mr. NITHYANANDA, internally all of these entities were managed and controlled jointly as one entity by Mr. NITHYANANDA, SIVA and GOPAL, these entities did joint fundraising, and that Mr. NITHYANANDA with the assistance of GOPAL and SIVA made all policy decisions for these entities. SHINDE and BHAT were told by Mr. NITHYANANDA himself that "every penny" of expenditure for any of these entities was controlled and approved by Mr. NITHYANANDA.

26.     This complete unity of interest and total joint control of these entities was emphasized to CARMAN when Mr. NITHYANANDA, SIVA and GOPAL tried to recruit CARMAN to open an office and become local Coordinator of the ORGANIZATION in Austin, Texas, and continued thereafter. Specifically, at various times from 2006 through 2009 Mr. NITHYANANDA, SIVA and GOPAL and other managing agents of the Defendants such as GOPAL's wife Mrs. Jyothi Sheelum, Mr. Sreraman Narasiman, Mr. Balaji Santharam and Mr. Raj Krishnan represented in

{00037480.DOC}

meetings at which CARMAN was present that Nithyananda Sacred Arts, Ananda Galleria, Nithyananda Youth Foundation, Life Bliss Galleria, Nithyananda Temple Arts, LLC, Nithyananda Anna Mandir, Nithyananda Ashrams, Nithyanand Vedic Temples, Nithyananda Foundation of Ohio and all of the Nithyananda Dhyanapeetam locations gradually opened across the U.S. such as Nithyananda Dhynapeetam of St. Louis, Nithyananda Dhynapeetam of Phoenix, Nithyananda Dhynapeetam of Seattle, Nithyananda Dhynapeetam of New York, Nithyananda Dhynapeetam of Columbus, Nithyananda Dhynapeetam of Houston, Nithyananda Dhynapeetam of North Carolina, and in other cities in the U.S., were jointly controlled 100% by Mr. NITHYANANDA, SIVA and GOPAL, internally operated by them as one entity, all funds collected by any of these entities were pooled,  all revenues and expenditures for any of these entities were controlled and  approved by Mr. NITHYANANDA with the assistance of GOPAL and SIVA, and the three Individual Defendants made all policy decisions for these entities.

27. DALAL's contributions to entities such as "Nithyananda Sacred Arts," "Nithyananda Anna Mandir" and "Nithyananda Dhynapeetam" or "Nithyananda Vedic Temples" or "Nithyananda Ashrams" were made only because at various times from 2006 through February 2010 Mr. NITHYANANDA, SIVA, GOPAL, and others such as GOPAL's wife Mrs. Jyothi Sheelum, Mr. Balaji Santharam, Mr. Sreraman Narasiman and Mr. Raj Krishnan represented in meetings at which DALAL was

present that Nithyananda Sacred Arts, Ananda Galleria, Nithyananda Youth Foundation, Life Bliss Galleria, Nithyananda Temple Arts, LLC, Nithyananda Anna Mandir, Nithyananda Ashrams, Nithyananda Vedic Temples, and all of the various Nithyananda Dhyanapeetam locations gradually opened across the U.S. such as in St. Louis, Bloomington, Seattle, New York, Columbus, Houston, North Carolina, and elsewhere, and were all one and the same, they were jointly operated as one entity, and all expenditures and revenues for any of these entities was approved by Mr. NITHYANANDA with the assistance of SIVA and GOPAL. Whenever DALAL would be willing to make a contribution, these personnel such as GOPAL, Mrs. Joythi Sheelum (GOPAL's wife), SIVA, Mr. Balaji Santharam, Mr. Sreraman Narasiman or Mr. Raj Krishnan would tell DALAL which entity to write the check or make the payment. DALAL did not select the entity on the check or to which his credit card payment was to be made, the Defendants and their managers did, and the name(s) differed at different times. DALAL, along with his wife, also contributed monthly and received e-mails telling them that their credit card account was billed by "Nithyananda Dhynapeetam."

28.     The Defendants' own internal e-mail dated April 17, 2010 admits to fifteen of these entities being "the organization." (*See* Exhibit F page 2 of 6, fourth bullet point.) Other entities were not referenced only because by that time they had been dissolved or had no assets to strip.

29.    In 2011, Plaintiffs learned from a Mr. Suresh Pillai in Ohio that he was told by SIVA that Defendant NITHYANANDA FOUNDATION and Defendant LIFE BLISS "are one and the same."

30.    Since 2005, others in India such as Mr. Kishen Reddy, an insider in the ORGANIZATION based in India who attended a number of late-night meetings with Mr. NITHYANANDA, sometimes with SIVA and GOPAL present or telephonically participating, observed that Mr. NITHYANANDA, along with SIVA and GOPAL controlled and made all of the policy decisions for the entities listed in paragraph 33 below.

31.    NITHYANANDA ORGANIZATION's documents--which were produced in the Popatlal Savla case after April 2011--show that Defendants NITHYANANDA FOUNDATION, LIFE BLISS, NDTCC and many of the aforementioned Nithyananda entities across the U.S. operated as one ORGANIZATION, with assets being commingled, and the three Individual Defendants controlled the local Coordinators.

32.    The Individual Defendants additionally controlled each entity within NITHYANANDA ORGANIZATION by:

        (1) their joint day-to-day management by the same persons (Sandhya Bail was the CFO of Defendants NITHYANANDA FOUNDATION and LIFE BLISS at the same time; Defendant SIVA was on Defendant NITHYANDA

FOUNDATION's Board from 2004 to November 2007 and in 2006 was on Defendant LIFE BLISS' Board and its President through February 2007 and in June 2007 was on Defendant NDTCC's Board in 2008 and was a Member of Nithyananda Investments and Nithyananda Investments LLC and was the President of Defendant NDTCC in 2011; SIVA's wife, Ragini was Defendant NITHYANANDA FOUNDATION's Director in 2006-07 and 2010-11, a Director of Defendant LIFE BLISS FOUNDATION from 2007 to February 2011, and in 2011 was the President of both Defendants NITHYANANDA FOUNDATION and LIFE BLISS; and Defendant GOPAL and his wife, Joythi, were both co-Directors of LIFE BLISS);

(2) interlocking boards of directors (SIVA was President of the International Governing Body Commission of Nithyananda Dhyanapeetam and Nithyananda Mission (CA Corporation No. C3257947) ("Nithyananda Governing Body"), and Nithyananda Cultural Center, an Incorporator of Ananda Yoga Foundation (OK Corporation No. 2112030999) ("Ananda Yoga"), Nithyananda Foundation (OK Filing No. 2112031162) ("Nithyananda Dhyanapeetam OK") and NITHYANANDA FOUNDATION,  and with Mr. NITHYANANDA a Member of Nithyananda Investments, LLC (CA Filing No. 200731110064) ("Nithyananda Investments"), and for NITHYANANDA FOUNDATION SIVA was a Director from 2004 to November 2007 and again from 2010 to

2011; SIVA's wife, Ragini was a Director from 2006 to 2007 and again from 2010 to 2011; GOPAL was President of Nithyananda Yoga & Mediation University (CA Corporation No. C2946592) ("Nithyananda University"), Nithyananda Dhyanapeetam of Seattle (WA Corporation No. 602763974) ("Nithyananda Dhyanapeetam WA"), Nithyananda Dhyanapeetam of Houston (TX Corporation No. 0800980079) (voluntarily dissolved April 3, 2011) ("Nithyananda TX"), and NTHLEAP (CA Corporation No. C2641655) (suspended September 9, 2008) as well as a Director of Hindu University of America, Inc. (FL Corporation No. N34702) ("Hindu University") and a Registered Agent of Nithyananda Spiritual Healing Research Foundation, Inc. (CA Corporation No. C2851586) (dissolved March 26, 2007) ("Nithyananda Research"), and a Director of NITHYANANDA FOUNDATION from 2004 to 2007; and GOPAL's wife, Jyothi, was a Director of NITHYANANANDA FOUNDATION from March 2005 to 2012);

(3) operating from the same location (NDTCC was doing business at the same location as NITHYANANDA FOUNDATION, LIFE BLISS and Nithyananda Yoga & Meditation University);

(4) using the same telephone number from a particular location for many of the entities;

---

{00037480.DOC}

(5) having the same person serve as CFO of several of these entities (Ms. Bail was the CFO of NITHYANANDA FOUNDATION, LIFE BLISS and NDTCC at the same time, her own rent was paid by Defendant NDTCC and at the same time she is also a Director of NDTCC, LIFE BLISS, Nithyananda Yoga & Meditation University, and Nithyananda Dhyanapeetam of Phoenix and of St. Louis and of New York, and a Trustee of Nithyananda Meditation Academy);

(6) formal documents such as insurance policies state that one entity was the "dba" of another (NITHYANANDA FOUNDATION's insurance policy listed that it was doing business as NDTCC), and then, on insurance policies NDTCC claimed ownership status of the Montclair Property even though only NITHYANANDA FOUNDATION is listed on the title as the owner;

(7) freely moving funds between these instrumentalities (NITHYANANDA FOUNDATION received $300,000 and $250,000 from LIFE BLISS and NDTCC in June 2010 when Defendant SIVA was on Defendant NDTCC's Board, and all three entities had the same CFO);

(8) joint fundraising for all of these entities (*see* Exhs. C & D);

(9) joint donor lists (*id.*);

(10) booking assets and revenues of NITHYANANANDA FOUNDATION

{00037480.DOC}

sales through "Ananda Galleria" to NDTCC and/or LIFE BLISS; and

(11) SIVA and GOPAL and other agents of these entities told one or the other of the Plaintiffs to make checks payable to one of these entities even after they were told by the contributors that their donations were intended for an entity in NITHYANANDA ORGANIZATION.

33.   Accordingly, there is a unity of interest between the Defendants and the following twenty entities:

1. Nithyananda Sacred Arts; Sacred Arts;

2. Nithyananda Youth Foundation;

3. Nithyananda Temple Arts, LLC

4.  Nithyanada Foundation in Ohio

5.  Nithyananada Dhyanapeetam of Columbus

6.  Nithyananda Dhyanapeetam, LLC

7.  Nithyananada Dhyanapeetam of New York

8.  Nithyananda Dhyanapeetam of St. Louis

9.  Nithyananda Dhyanapeetam of Oklahoma

10. Nithyananada Dhyanapeetam of North Carolina

11. Nithyananda Dhyanapeetam of Houston

12. Nithyananda Dhyanapeetam of Seattle

13. Nithyananda Dhynapeetam of San Jose

---

{00037480.DOC}

14. Nithyananda Dhynapeetam of Phoenix

15. Nithyananda Dhynapeetam of Bloomington

15. Nithyananda Yoga Foundation

16. Nithyananda Anna Mandir

17. Ananda Galleria

18. Life Bliss Galleria

19. Nithyananda Ashrams

20. Nithyananada Vedic Temples.

## WHY AN INEQUITABLE RESULT WILL FOLLOW IF THE COURT TREATS THE ENTITIES AS SEPERATE

34.    The main remedy sought by this lawsuit is injunctive relief against the entire NITHYANANDA ORGANIZATION.  Beginning in March 2010, Plaintiffs learned that at all times relevant Mr. NITHYANANDA and SIVA and GOPAL controlled and operated NITHYANANDA ORGANIZATION and these alter ego entities as their own personal piggybanks or ATM machines.  They learned from Mr. Kishen Reddy in India and Mr. Morolia in Houston that internally Mr. NITHYANANDA and SIVA and GOPAL made all of the financial decisions on NITHYANANDA ORGANIZATION's and their interrelated, alter ego entities' behalf.

35.     Mr. NITHYANANDA and the other Individual Defendants transferred funds from one entity to another or sold assets of these entities at will, including transferring $710,478.96 between January 30, 2007 and October 5, 2009 from LIFE BLISS to an entity called Nithyananda Imports and Exports in India which was created, operated and run by Mr. NITHYANANDA's brother.  As one way to "cover up" or conceal these impermissible transactions which moved large sums of money out of NITHYANANDA ORGANIZATION, Mr. NITHYANANDA and his brother originated, inflated and falsified invoices from Defendant TRUST in Bangalore, India to the non-profits in the U.S.  On or about April 17, 2010, a former contributor named Popatlal Savla obtained a printout of invoices from Mr. Balaji Santharam, totaling $550,386.82 from Mr. NITHYANANDA's brother's company (Nithyananda Imports and Exports) for statues that Mr. Savla later learned cost less than $100,000.

36.     One Plaintiff, SHINDE, learned after March 2010 that Defendant NITHYANANDA FOUNDATION hid over $700,000 of its sales revenues from its Ananda Galleria sales shop at the Montclair Property in other entities such as Defendants NDTCC and LIFE BLISS.  The other Plaintiffs, namely BHUTADA, TAYI, BHAT, CARMAN and DALAL, learned of this only after March 2011.

37.     In 2011, Plaintiffs learned that SIVA had stolen assets (a 29.1% interest in Search by Rank, LLC) which a contributor, Suresh Pillai in Ohio, donated to another non-profit in NITHYANANDA ORGANIZATION.

{00037480.DOC}

38.     In April 2010, NITHYANANDA FOUNDATION's own financial statements showed new revenue of over $4 million. In September 2011, NITHYANANDA FOUNDATION restated its own financials through April 2010 to suddenly show a loss of $236,112.97. Yet, in March 2010, millions of dollars were found in bank accounts in India controlled by Mr. NITHYANANDA, which both SIVA and GOPAL also knew about, because all three Individual Defendants told Kishen Reddy in India that over $6 million of these funds came from what Plaintiffs have identified as the "alter-ego" entities in the United States.

39.     In July 2012, NITHYANANDA FOUNDATION took the position that it had no assets and actually owed $650,000 to co-defendants LIFE BLISS and NDTCC for loans supposedly given to it by these co-defendants when all three defendants had overlapping Directors and the very same CFO for all three entities.

40.     In January 2013, NITHYANANDA FOUNDATION encumbered its Montclair Property with a lien of $625,000.

41.     In 2012, Plaintiffs learned that NITHYANANDA ORGANIZATION entities in the U.S. issued hundreds of thousands of dollars in so called "grants" to the TRUST in India without adequate supporting documentation, whereupon Mr. NITHYANANDA alone controlled those funds in India, which were ostensibly in the name of the TRUST. In 2012, Defendants could not explain how NITHYANANDA FOUNDATION's $3,030,339.26 cumulative surplus as of April 2010 was spent,

---

{00037480.DOC}

could not explain the transfer of over $2 million sent to India in the form of so called "grants," and could not account for over $2 million in net revenue shown on financial documents of entities within NITHYANANDA ORGANIZATION.

42. From inception, NITHYANANDA FOUNDATION, LIFE BLISS and NDTCC were each undercapitalized for their liabilities, and as Exhibit F--which one of the Plaintiffs, SHINDE, saw for the first time only in or around mid-2011, and which the other Plaintiffs saw for the first time even later, sometime in 2012,--reveals, there was a plan in April 2010 to strip all remaining assets they had and move those assets to other entities controlled by the three Individual Defendants, or to newly formed non-profits, expressly to evade claims of creditors like Plaintiffs.

43. An inequitable result would follow if the Court treats as separate the three Defendant corporations, the Defendant TRUST in India, the twenty other entities identified in paragraph 33 above, and the three Individual Defendants, because the Individual Defendants and these entities in NITHYANANDA ORGANIZATION themselves did not treat them as separate in the regular course of their activities over many years, but co-mingled and pooled their revenues, moved money and assets from entities whenever they pleased, moved much of the money to the TRUST in India, solicited donations on behalf of all entities interchangeably rather than on behalf of one or the other, were all jointly controlled by the three Individual Defendants, and when the Individual Defendants feared a particular entity faced liabilities they

engaged in asset-stripping, as plainly demonstrated by Exhibit F.   As a result of Defendants' conduct, these entities are unable to satisfy a judgment in this case.

44.   To treat the four named entity Defendants, the twenty entities listed in paragraph 33 and the three Individual Defendants as separate will work an injustice on Plaintiffs because most of the money has drained to India where Mr. NITHYANANDA had (and still has) full control over all of the assets in India, ostensibly sent to or kept in the TRUST, and the Individual Defendants have demonstrated they can effortlessly move assets in anticipation of any liability. These Defendants have already shown their plan for exposure to any liability is to strip assets and leave a shell behind. Exhibit F--which covers fifteen entities--is their plan for precisely this kind of lawsuit.  To treat the Individual Defendants and the entities in the ORGANIZATION as distinct in this case, to honor the separateness of these entities, would reward their premeditated efforts to evade liabilities, is a deliberate abuse of the separateness of a corporate entity, and would work an injustice on Plaintiffs.

## DOE DEFENDANTS

45.   The true names and capacities of the Defendants sued as DOES 1 through 10 inclusive, are unknown to Plaintiffs, who therefore sue Defendants DOES 1 through 10 with fictitious names.  When the true names and capacities of the DOE Defendants are ascertained, Plaintiffs will seek leave to amend this complaint.

{00037480.DOC}

46.     Plaintiffs are informed and believe--and based thereon allege--that each of the Defendants is responsible in some other actionable manner, for the events, happenings and omissions referred to herein and caused the damages proximately resulting to Plaintiffs, and each of the Individual Defendants was a co-conspirator of his co-defendants, and in doing the things alleged in this complaint was acting within the course and scope of the conspiracy.

## MR. NITHYANANDA WAS NITHYANANDA ORGANIZATION'S LEADER, MANAGING AGENT AND ALTER EGO

47.     At all relevant times, NITHYANANDA ORGANIZATION's principal, creator, co-founder, chief, primary or most important person, ostensible, managing agent and alter ego with the full authority to speak and act on NITHYANANDA ORGANIZATION's behalf, who was regularly held out by NITHYANANDA ORGANIZATION as its most important managing agent with the apparent and actual authority to bind NITHYANANDA ORGANIZATION, and who publicly and privately gave orders to control –and controlled-- NITHYANANDA ORGANIZATION's employees, agents, officers and directors, and whose public and private instructions each of the other Defendants abided by, is Individual Defendant MR. NITHYANANDA.

48.     NITHYANANDA ORGANIZATION itself described Mr. NITHYANANDA as its "leader." In Plaintiffs' presence and during events on and off NITHYANANDA

ORGANIZATION's premises, NITHYANANDA ORGANIZATION cloaked Mr. NITHYANANDA with all of its authority, not only calling him its "leader" in publications, but publicly abiding by his every wish and whim. Because of the substantial extent and great degree to which Mr. NITHYANANDA was allowed to control--and controlled--NITHYANANDA ORGANIZATION's details, operations and expenditures, Mr. NITHYANANDA and NITHYANANDA ORGANIZATION share a unity of interest and are one and the same.

49.    For example, on April 23, 2007, Defendant GOPAL wrote that Mr. NITHYANANDA "wants you to be answerable to him, not anyone else…" A September 28, 2007 NITHYANANDA ORGANIZATION e-mail said "this valuable site which is under DIRECT supervision of Swamiji [Mr. NITHYANANDA] himself." (Capitals in original e-mail).  Mr. NITHYANANDA himself announced in writing to the world that "I, …, my secretary, and anyone associated with Nithyananda Dhyanapeetam, including but not limited to disciples, devotees, and other members of all related organizations in India and abroad promise" we "will not harm" a particular individual.  Many volunteers had to sign a Declaration that stated: "I fully agree that Paramahamsa Nithyananda [Mr. NITHYANANDA] or the authorities of Nithyananda Dhyanapeetam can remove me from any position or authority." NITHYANANDA ORGANIZATION and each of the other Individual Defendants knew of, permitted and ratified Mr. NITHYANANDA's promise, made

{00037480.DOC}

on behalf of NITHYANANDA ORGANIZATION, again confirming Mr. NITHYANANDA's plenary ostensible authority to bind NITHYANANDA ORGANIZATION by his conduct.

50.   On information and belief, it is alleged that Mr. NITHYANANDA is the equitable owner of the NITHYANANDA ORGANIZATION and each of the alter ego entities listed in ¶ 33.  There is a unity of interest and ownership between Mr. NITHYANANDA and NITHYANANDA ORGANIZATION such that, in reality, their separateness does not exist, for the reasons set forth in  ¶¶ 22-44.

Moreover, the treatment of the actions in question in this complaint as those of NITHYANANDA ORGANIZATION  alone would lead to an inequitable result and promote an injustice, for the reasons set forth in ¶¶ 34-44.

51.   Mr. NITHYANANDA, SIVA and GOPAL were managing agents of NITHYANANDA ORGANIZATION because they exercised substantial independent authority and judgment in corporate decision making such that their decisions ultimately determined NITHYANANDA ORGANIZATION's policy.

52.   Even after March 2010, Mr. NITHYANANDA's level of involvement continued, as reflected by Defendant GOPAL's April 13, 2010 e-mail to Mr. Balaji Santharam in charge of accounting for NITHYANANDA ORGANIZATION, which stated he needed "to get a comprehensive idea about the Foundations to present to Swamiji." No Plaintiff saw this e-mail until some time in 2011 or 2012.

**MR. NITHYANANDA AND THE OTHER INDIVIDUAL DEFENDANTS**

**WERE NITHYANADA ORGANIZATION'S OSTENSIBLE AGENTS**

53.     NITHYANANDA ORGANIZATION held out Mr. NITHYANANDA and the other two Individual Defendants SIVA and GOPAL to have--and Mr. NITHYANANDA and the other two Individual Defendants exercised--ostensible authority to act on NITHYANANDA ORGANIZATION'S behalf and NITHYANANDA ORGANIZATION is bound by Mr. NITHYANANDA's and SIVA's and GOPAL's acts--regardless of whether or not they held any legal title such as officer, director, agent or employee of NITHYANANDA ORGANIZATION.

54.     In addition, other managing agents of the Defendants were GOPAL's wife Mrs. Jyothi Sheelum, Mr. Sreraman Narasiman, Mr. Balaji Santharam, Mr. Santharam's wife Jayalakshmi Jayapal, Mr. Prakash Morolia, and Mr. Raj Krishnan, some of whom were Defendants' local Coordinators.

**FIRST CAUSE OF ACTION**
**FRAUD AND DECEIT**
**[Against All Defendants]**

55.     Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

**REPRESENTATIONS AS TO PLAINTIFF MANOHAR SHINDE**

56.     SHINDE personally met with Mr. NITHYANANDA in March/April 2006 in Duarte, California. They discussed the concept of a University. The meeting lasted

from about 10 a.m. to about 6 p.m. Mr. NITHYANANDA told SHINDE that creating a University "is my real passion." SHINDE met with Mr. NITHYANANDA the very next week in Vancouver, Canada, and the following week in Seattle, Washington, to discuss the creation of a University.

57.    In June 2006, SHINDE went on a trip to the Himalayas with Mr. NITHYANANDA and with Defendants SIVA and GOPAL. During the trip each of these three Individual Defendants told SHINDE that Mr. NITHYANANDA and Defendant SIVA had started a non-profit organization in 2004 in the U.S. called NITHYANANDA FOUNDATION. Mr. NITHYANANDA himself told SHINDE on that occasion that it was a public charity, and that every penny collected by NITHYANANDA FOUNDATION (which Mr. NITHYANANDA had founded with Defendant SIVA) would not be accessible to him or used for any of the insiders who set up the Foundation,  but would be used exclusively for charitable purposes.

58.    In the context of soliciting donations from SHINDE to NITHYANANDA FOUNDATION, Mr. NITHYANANDA personally volunteered to SHINDE during that trip that Mr. NITHYANANDA owned nothing, had forsaken all material goods, did not own anything other than one tunic he wore and another he washed, and his toiletries and sandals. Both Defendants GOPAL and SIVA each told SHINDE during that trip that they each lived with Mr. NITHYANANDA in India and vouched to SHINDE that Mr. NITHYANANDA's representations were true and SHINDE could

{00037480.DOC}

rely on them without question. They both told SHINDE specifically that Mr. NITHYANANDA did not own anything, and NITHYANANANDA FOUNDATION was solely for non-profit purposes and did not benefit Mr. NITHYANANDA or them in any way.   SIVA and GOPAL informed SHINDE during that trip that they themselves had donated all of their personal assets to Mr. NITHYANANDA's non-profit, and they requested SHINDE consider doing the same.

59.   SHINDE met with Mr. NITHYANANDA again in December 2006. Mr. NITHYANANDA brought up the University topic. SHINDE inquired of Mr. NITHYANANDA whether there should have a small informal committee to focus attention on the University.  Mr. NITHYANANDA quickly approved of the idea. In March 2007, Mr. NITHYANANDA appointed three persons, including SHINDE, to NITYHANANDA FOUNDATION's unpaid "University Steering Committee."

60.   Defendant GOPAL invited SHINDE to attend a meeting with Mr. NITHYANANDA, GOPAL and SIVA in Vancouver, Canada in early April 2007 for SHINDE to discuss the University with Mr. NITHYANANADA. During that meeting, Mr. NITHYANANDA confirmed for SHINDE--in the presence of SIVA and GOPAL--that the primary purpose of that meeting was to formulate a plan to hold a fundraiser in Southern California to solicit funds to build a University in Southern California. Mr. NITHYANANDA himself said the fundraiser should target "millionaires and charitable persons, and donors, large donors." These were his

words. That meeting lasted for the better part of two days.

61.     In April or May 2007, Mr. NITHYANANDA told SHINDE that the University was his highest priority.

62.     Between May and June 22, 2007, SHINDE met with Mr. NITHYANANDA approximately two are three times each week in Duarte, California to discuss Mr. NITHYANANDA's plan for NITHYANANDA FOUNDATION to operate a University in Southern California. All these meetings occurred on the premises of Defendant NITHYANANDA FOUNDATION. Defendant GOPAL was present during those meetings on several occasions in this two month period. During this two month period, Defendant SIVA spoke to SHINDE by telephone at least once. SIVA repeated the above representations of Mr. NITHYANANDA's renouncement of all material things and his assurance money collected would not be spent on themselves, but would be used for the specific purpose for which it was contributed.  SHINDE understood this was to encourage him to contribute.

63.     During these meetings in May and June 2007, SHINDE sat in Mr. NITHYANANDA's personal/private room on the premises of NITHYANANDA FOUNDATION, sometimes with four or five academic people. Dr. Dilip Parekh from the Los Angeles area participated in about 70% of these meetings and he explained that he was not religious but was attending the sessions because the University was for promoting cultural development of Indian values.

---

{00037480.DOC}

64.     In May and June 2007, during these meetings, Mr. NITHYANANDA's expressed desire was to start the University "as soon as possible." With regard to the fundraiser, SHINDE observed from his attendance during these meetings held twice or three times a week that all of the decisions, including who was to be invited, what the agenda would be, who would speak and how much time Mr. NITHYANANDA would speak, was carefully decided by Mr. NITHYANANADA and GOPAL.

65.     Based on all of these representations by Mr. NITHYANANDA, SIVA and GOPAL, SHINDE committed to donating approximately $8,000 per month and made the first payment to NITHYANANDA FOUNDATION in early June 2007, even before the fundraiser for the University that occurred in the third week of June 2007. NITHYANANDA FOUNDATION's donation receipts for the initial months correctly described "University Project."

66.     On or about June 22, 2007, SHINDE received an email addressed to potential contributors and participants of the agenda for a two day "Brain Storming Retreat For the Proposed University" (hereinafter "fundraiser") to occur in Arcadia, California. SHINDE was present when Mr. NITHYANANDA came up with the title for that fundraiser. Mr. NITHYANANDA, SIVA and GOPAL each personally told SHINDE in advance of and then during the June 2007 fundraiser that they had each participated in formulating the agenda of the fundraiser.

67.     SHINDE attended the fundraiser which took place on June 23-24, 2007 in

Arcadia, California. Mr. NITHYANANDA himself was present and signed the invitation letter in the welcome package on behalf of Defendant NITHYANANDA FOUNDATION which was given to SHINDE at the beginning of the fundraiser. Mr. NITHYANANDA made presentations during the fundraiser that all of the funds raised for the University were to be used to create a University here in Southern California, would not be taken to India, and represented that the University's first phase would be completed in two years, and second phase in five years. Mr. NITHYANANDA represented publicly at the fundraiser that they had two properties in mind and that 80% of the work in finding the property was done. Defendants GOPAL and SIVA were also present during the fundraiser. GOPAL and SIVA each met SHINDE during the two day fundraiser and SHINDE witnessed GOPAL and SIVA hear Mr. NITHYANANDA's representations seeking funds to open a University in Southern California and heard Mr. NITHYANANDA's time line. GOPAL and SIVA announced SHINDE's financial contribution of $8,000 a month to those in attendance at the fundraiser for the University to generate more donations, and asked SHINDE to contribute more.

68.    SHINDE heard Defendant GOPAL announce, in the presence of Mr. NITHYANANDA and Defendant SIVA, that they would be applying (or had applied) for a separate non–profit status for a University.

69.    Sometime in the last week of June 2007, Mr. NITHYANANDA announced to

other potential contributors who attended the fundraiser and to SHINDE that Mr. NITHYANANDA was going to be the Chancellor of the University.  Sometime after June but before September 2007, Mr. NITHYANANDA told SHINDE that he had tentatively selected Mr. Aditya Namjoshi from San Diego to become the University's Vice-Chancellor.

70.     In October 2007, SHINDE was informed by Mr. NITHYANANDA and Defendant GOPAL that a building and the property it was on in Montclair, California would be bought by NITHYANADA FOUNDATION.  Mr. NITHYANANDA and Defendant GOPAL invited SHINDE to come for a tour of the Property and during the tour Mr. NITHYANANDA stated to SHINDE in advance of the purchase of that Property that a temple would be installed on part of the premises but was just a temporary, initial step, because the purpose was for the Property to serve as a campus of the University. SIVA met SHINDE in October or November 2007 at a function at the Duarte premises, thanked SHINDE for his monthly contributions, and again asked SHINDE to contribute more.

71.     In November - December 2007, Mr. NITHYANANDA and SHINDE, Mr. Popatlal Savla, Dr. Rambhatta, and Professor Vasant Joshi, went together to visit Soka University of America in Orange County, which was started about 15 years ago. In response to Mr. NITHYANANDA's inquiry, SHINDE told Mr. NITHYANANDA on that tour that Soka University is accredited by the Accrediting Commission for

Senior College and Universities of the Western Association of Schools and Colleges. Mr. NITHYANANDA said to those present, including SHINDE, "something like this, we shall have it."

72.     Based on these representations by Mr. NITHYANANDA, GOPAL and SIVA, SHINDE made a personal commitment to make a donation of $100,000, to be paid over a year, towards the operation of a campus of a University on the property in Montclair. Between June 2007 and June 2008, SHINDE contributed $100,000 for this purpose. This included one check for $50,000 dated October 11, 2007 to NITHYANANDA FOUNDATION. SHINDE was told in 2008, within a week but at most ten days of receiving his donation receipts, and again in late 2009 within a week but at most ten days of receiving his donation receipts by Mr. Balaji Santharam to disregard the inaccurate descriptions on the donation receipts he was mailed for his contributions. Mr. Santharam explained to SHINDE that Mr. Santharam's wife, Priyalakshmi Jayapal, was responsible for the accounting paperwork of the entities in the NITHYANANDA ORGANIZATION, and volunteers assisting in the accounting had issued numerous donation receipts in the name of one or the other Defendants unaware of the specific purpose for which many donations--including SHINDE's-- were designated, and to disregard any inaccurate descriptions on his donation receipts.

{00037480.DOC}

73.     SHINDE was told by Mr. NITHYANANDA in March/April 2006 in Duarte, California, and in June 2006 by Mr. NITHYANANDA, SIVA and GOPAL during a trip to the Himalayas, that all the programs, workshops, speaker series, and sales of audio or print materials offered or to be offered by or through any entities in NITHYANANDA ORGANIZATION would be offered to the public at cost. These three Individual Defendants explained to SHINDE that revenues were only raised from a particular program to match the expenses for that program.  Later, in March 2007, Mr. NITHYANANDA explained to SHINDE that the price of each program LIFE BLISS FOUNDATION offered would be strictly to recover the expense for that program, without any added markup.  GOPAL and SIVA made the same representations regarding LIFE BLISS FOUNDATION to SHINDE in June 2007. Between June and October 2007, Mr. Raj Krishnan, who SHINDE witnessed was a local Coordinator in Duarte and then Montclair, California in the second half of 2007, made the same representations regarding Defendant NDTCC.

74.     SHINDE relied on these representations in deciding to contribute anything to any of the entities in NITHYANANDA ORGANIZATION.

75.     In 2011, SHINDE learned from a lawsuit commenced by another donor, Mr. Popatlal Savla, that revenues raised by these entities far exceeded the costs to put on programs they offered.  Had SHINDE known this was going to occur or was occurring, he would not have contributed anything to any of the defendants.

76.    On October 22, 2007, SHINDE attended an event at the Duarte premises of Defendant NITNYANANDA FOUNDATION where Mr. NITHYANANDA announced publicly the opening of the University at the Montclair premises. Defendant GOPAL was present during that event and SHINDE witnessed GOPAL hear that announcement.

77.    In February 2008, Mr. NITHYANANDA told SHINDE he had promised Vasant Joshi, the former Vice Chancellor of a University in India, a full time job to run the newly created University in Montclair, but they had an application pending to the City of Montclair to remodel the building, and they were awaiting permission to commence the remodel.

78.    In June/July 2008, another Los Angeles resident named Dr. Dilip Parekh and SHINDE visited Mr. NITHYANANDA in India. Mr. NITHYANANDA said the University was being held up by Montclair city approval for the remodel, but was otherwise ready to go.

79.    Around June/July 2009, and again sometime between December 2-22, 2009, SHINDE met Mr. NITHYANANDA, GOPAL and SIVA in India. During all of these meetings Mr. NITHYANANDA--with SIVA and GOPAL present--announced they remained committed to building the University on the Montclair property, but that they were simply awaiting building permits from the City of Montclair to commence remodeling.

80.     Relying on their representations, SHINDE told Mr. NITHYANANDA and GOPAL in August 2009 that SHINDE will extend his retirement, and instead of retiring in August 2009, SHINDE would retire in 2010, and would work for two days a week, and other than taxes, every dollar SHINDE earned would be given for the University. SHINDE continued to pay $8,000 a month for the University on the Montclair Property through January 2010 which amounted to another $50,000.

81.     Commencing in 2009, SHINDE gave a total of about $50,000 total spread out in six monthly installments (between August 2009 and January 2010). SHINDE only wrote the checks out to LIFE BLISS or to NDTCC instead of to NITHYANANDA FOUNDATION because GOPAL and SIVA and Mr. NITHYANANDA and others involved in collecting funds here in the U.S. on their behalf including Mr. Balaji Santharam and Mr. Sreraman Narasiman told SHINDE on more than half a dozen occasions that NITHYANANDA FOUNDATION, LIFE BLISS FOUNDATION and NDTCC were one and the same, and they instructed SHINDE to whom each check was to be written. Sreraman or Balaji told SHINDE, this time write it to this entity, next time to that entity, and, usually, it was different names.

82.     During March 2010, SHINDE read in newspapers that Mr. NITHYANANDA had millions in bank accounts in India to which he was a signatory. Later, SHINDE was informed that in the last week of March 2010 that Mr. NITHYANANDA had told Mr. Popatlal Savla, another Los Angeles contributor to the University, that Mr.

NITHYANANDA had made a proposal to return to him the equivalent value of his donation.   Around March 30 or 31, 2010, SHINDE received a copy of an e-mail authored by GOPAL, which indicated to SHINDE that Mr. NITHYANANDA intended to return large donations to the donors.

83.    SHINDE would not have contributed anything if he knew of the true facts set above and which are summarized in ¶¶ 159-162, 164-195 and 197-201.

84.    SHINDE learned, for the first time in April, 2010, that his money meant for the University in Montclair was not being used as promised, and the purpose of the University was utterly not fulfilled. During conversations SHINDE had with SIVA in April, 2010 including at the Acapulco Mexican restaurant in Glendale, California, SHINDE told him the purpose of 100% of his contributions for the University in Montclair was not fulfilled and requested a return of at least some of the contributions. SIVA agreed in principle.  A few months later, SHINDE received an email from SIVA refusing to return any of his donations. SHINDE does not remember the exact date in April that he met with DEFENDANTS' managing agent, SIVA, but even calculating from the very first date in April, namely April 1, 2010 to the February 27, 2013 date of the filing of SHINDE's original complaint in this action is two years, ten months and twenty-six days.  Even if the ten or fewer days between the date SHINDE received his inaccurate donation receipts and the date of the affirmative fraudulent instructions of Defendants' managing agent to SHINDE to

disregard those descriptions is added to the two years, ten months and twenty-six days, SHINDE's fraud claims premised on the University fraud was asserted within the three year statute of limitations period, and is timely and actionable.

## REPRESENTATIONS AS TO PLAINTIFF BALA BHAT

85.   BHAT met Mr. NITHYANANDA in Duarte, California sometime in 2005. Mr. NITHYANANDA represented to BHAT that he owned nothing, had given away everything he owned, aspired to own nothing, and was running a non-profit entity named NITHYANANDA FOUNDATION from which he received nothing. Mr. NITHYANANDA represented to BHAT that Mr. NITHYANANDA's renouncement of everything material showed that he was the right steward of any contributions BHAT or others made to his non-profit entity.

86.   Between that first meeting and several meetings in the following months in 2005 and early 2006 which occurred in Duarte, California,  Mr. NITHYANANDA vouched to BHAT that not a single dollar received by the NITHYANANDA FOUNDATION went to benefit him or any insider, or was spent on any purpose other than for what any contribution was specifically made. Furthermore, Mr. NITHYANANDA represented that in light of the non-profit purpose of his ORGANIZATION, all programs, workshops and seminars were priced for the public at the cost to the ORGANIZATION to put on that particular program, and all items sold to the public were sold at cost.  Mr. NITHYANANDA represented that all

money collected in the U.S. by any entity in his ORGANIZATION would stay here in the U.S. for charitable work here, and nothing would go to India. This information was conveyed by Mr. NITHYANANDA to BHAT and to others present at public events. These statements were made in a fund raising context. In fact, at one such public meeting, Mr. NITHYANANDA became annoyed when BHAT publicly narrated the question of a potential donor who said he wanted to know where the money he would donate would be spent. Mr. NITHYANANDA said he had addressed this issue too many times before, and repeated these representations and gave his personal assurance that not even a check for $500 could be issued without his approval. GOPAL was present.

87.     Defendant GOPAL was present for over half a dozen of these meetings in 2005 and 2006 and GOPAL repeated publicly at the beginning of these meetings that he could confirm 100% that Mr. NITHYANANDA owned nothing and had forsaken everything material, because GOPAL said he lived with Mr. NITYANANDA. GOPAL confirmed that all programs, seminars and items sold were sold at cost, and not at a profit.  GOPAL confirmed all monies raised in the U.S. would stay in the U.S. for charitable work here. GOPAL told BHAT that for these reasons Mr. NITHYANANDA was the one person he could trust to run their non-profit ORGANIZATION.

88.     GOPAL informed BHAT on multiple occasions in 2005 and 2006 during several meetings that BHAT attended in Duarte, California, that GOPAL owned a lucrative I.T. company in the Bay area but that he was winding it down to work full time for the non-profit, and he had donated all of their family's personal assets to Mr. NITHYANANDA's non-profit ORGANIZATION.

89.     In 2006, Mr. NITHYANANANDA mentioned to BHAT that his non-profit ORGANIZATION wanted to start a University in Southern California. Mr. NITHYANADA said opening a University was his "passion."  He said it would foster Indian cultural knowledge locally. He repeated this pitch very often in meetings BHAT attended on weekends at Duarte in 2006.  In gatherings attended by GOPAL in 2006 at which BHAT was present Mr. NITHYANANDA referred specifically to the University here in Southern California and said "Whatever you can, I want you to contribute to this good cause." GOPAL then repeated this solicitation to BHAT.

90.     Based on the statements of Mr. NITHYANANDA as backed by the statements of GOPAL, and the conviction they gave BHAT that Mr. NITHYANANDA's non-profit ORGANIZATION would soon open a University in Southern California, and each of the other representations set out above, BHAT took a home equity loan on his home in San Luis Obispo and gave $50,001 in November 2006 and another $50,001 in January 2007 both by check to NITHYANANDA FOUNDATION.  BHAT told both Mr. NITHYANANDA and GOPAL these donations were intended specifically

for the opening of a University in Southern California. They acknowledged this, and assured BHAT it would be spent only for this purpose. BHAT made these contributions in reliance on their representations as to Mr. NITHYANANDA's renouncement of all material goods, as to how the ORGANIZATION operated—i.e. that all programs, workshops and seminars or sold materials were offered at cost of the program or item and not to make any profit, that no insider benefited or could or would benefit, that all money collected in the U.S. by the ORGANIZATION would be used for charitable work here in the U.S., Mr. NITHYANANDA's assurance he approved all expenditures, and because BHAT was led by Mr. NITHYANANDA and GOPAL to believe the University would be started within a year and BHAT's donation would be used only for that purpose.

91.     After BHAT contributed the $100,002 for the University, BHAT received an invitation from NITHYANANDA FOUNDATION to attend a June 23-24, 2007 "Brainstorming Retreat for the Proposed University." BHAT still has the original invitation page signed in blue ink personally by Mr. NITHYANANDA on behalf of NITHYANANDA FOUNDATION. It was given to him in a white binder that was distributed to all of the attendees upon arrival at the two day event.

92.     NITHYANANADA FOUNDATION even booked BHAT's hotel room for his stay in the Los Angeles area overnight for this event. NITHYANANDA FOUNDATION arranged to shuttle him back and forth by car from his hotel to the

{00037480.DOC}

place where the two day event was held. BHAT attended the full two day event. BHAT was left with the impression listening to Mr. NITHYANANDA and to GOPAL and to SIVA during those two days that NITHYANANDA FOUNDATION intended to open the University here in Los Angeles as soon as possible. During the June 23-24, 2007 "Brainstorming Retreat for The Proposed University," BHAT heard a pitch from Mr. NITHYANANDA and Defendants GOPAL and SIVA for additional financial contributions to fund the University.

93.     In October 2007, BHAT heard of the inauguration of the University at the Montclair location. BHAT was pleased with the progress of the University up to this point.

94.     Within a week but at most ten days to two weeks of receiving his donation receipts in the mail BHAT was told in late 2007  by Mr. Raj Krishnan, Defendants' local Coordinator for Montclair and Defendants' ostensible agent, to disregard the inaccurate descriptions on the donation receipts that Defendants mailed to BHAT within the prior two weeks for his contributions. Mr. Krishnan explained to BHAT that volunteers assisting in the accounting had issued numerous erroneous donation receipts to different donors in the name of one or the other entities unaware of the specific purpose for which many donations--including BHAT's--were designated.  In late 2007, and again in early 2008, Mr. Krishnan assured BHAT that his $100.002 donation remained designated only for the University project.

95.    Relying fully on these affirmative representations BHAT received from Mr. Krishnan, in the first half of 2008, BHAT was invited for and attended a tour of the Montclair facility by the local Coordinators of the Montclair facility of NITHYANANDA FOUNDATION. It was a fund-raising tour of the upstairs of the Montclair facility. BHAT was told NITHYANANDA FOUNDATION had already applied to the City of Montclair to remodel the upstairs to install classrooms for the University at the Montclair facility, and BHAT was asked to contribute more for the University at the Montclair structure. BHAT attended other such meetings for monthly contributors.  GOPAL and SIVA occasionally spoke at these meetings for monthly contributors, and BHAT heard both of them say the University was being held up as they awaited approval from the City of Montclair to remodel to build the University at the Montclair facility.

96.    During one of these meetings in early 2009 at the Montclair facility, Mr. NITHYANANDA himself told BHAT that Mr. NITHYANANDA had collected over one million books in India and was just waiting to bring it to the University at Montclair as soon as the remodeling was approved by the City of Montclair and completed.

97.    BHAT learned for the first time some time in March 2011 from another contributor, Mr. Popatlal Savla, that the Defendants had no intention to fulfill their representations to build a University at Montclair.  Even assuming BHAT learned of

this on the earliest available date in March, which is March 1, 2011, one year, eleven months and twenty-six (26) days at most elapsed between March 1, 2011 and the February 27, 2013 date of his original complaint. Adding up to two weeks (at most) that elapsed between the date of BHAT's receipt of the inaccurate donation receipts and the affirmative fraudulent instructions to BHAT by Defendants' managing agent, Mr. Raj Krishnan, to disregard the description on the receipts--which tolled the three year statute of limitations--establishes that less than three years elapsed since BHAT was put on any kind of inquiry notice that his donations were not being used or would not be used for the University, as directed, and BHAT would not have contributed anything if he knew the true facts set forth above, and which are summarized in ¶¶ 159-162, 164-195 and 197-201.

98.    The principal amount of BHAT's contribution is $100,002 with the last payment being made in January 2006, and interest at 10% interest on this principal that has accrued since February 1, 2006 until May 25, 2013 is $63,151.94, and continues to accrue at $27.39 per day.

### REPRESENTATIONS AS TO PLAINTIFF SIVA TAYI.

99.    TAYI met Mr. NITHYANANDA at an APPI (American Association of Physicians of Indian origin) function conducted in Houston in mid-June 2005. Mr. NITHYANANDA volunteered during this meeting that he had forsaken all material things, did not own anything except the tunic he was wearing and one he washed and

kept, and had dedicated his life to a non-profit organization he ran to perform charitable work.  TAYI met Mr. NITHYANANDA again that weekend at some other event. Mr. NITHYANANDA repeated these representations at the second event.

100.   On March 23, 2006, Mr. NITYANANDA, SIVA and GOPAL were at an event and Mr. NITHYANADNA invited TAYI and few others to his chambers and talked about his renunciation of all material things and abandonment of ownership of anything of value, announced he had no money or assets in his name, and stated he had no need for money or assets in his name.  Both SIVA and GOPAL who were present seconded these representations as fact. SIVA told TAYI he could vouch for Mr. NITHYANANADA's representations because he and his wife had lived with Mr. NITHYANANDA and carefully observed him.   All three Individual Defendants asked for contributions to NITHYANANDA ORGANIZATION.

Later, in public, on March 23, 2006 both SIVA and GOPAL said the same things several times one-on-one to TAYI during the program and to the audience in general. That day Mr. NITHYANANDA asked TAYI his age and proposed that since TAYI was 56 he too should renounce all of his wealth and give all his wealth to NITHYANANDA FOUNDATION.

TAYI was told by Mr. NITHYANANDA in Houston in mid June 2005 and was present at a meeting in March 2006 where SIVA and GOPAL were present when Mr. NITHYANANDA repeated that and all the programs, workshops, speaker series,

{00037480.DOC}

and sales of audio or print materials offered by or through any entity in NITHYANANDA ORGANIZATION would only be offered to the public at cost. GOPAL explained to TAYI that charges for a particular program were designed to cover the ORGANIZATION's expenses for that program, and were not set to make any profit. TAYI relied in part on these representations in deciding to contribute anything to NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION or NDTCC or any other entity to which the Defendants directed him to write his checks.

101.   In June 2007, TAYI was invited by Mr. NITHYANANDA and GOPAL to a two day Brainstorming Retreat for a proposed University. TAYI flew from Houston and stayed overnight in California to attend this fundraiser held in Arcadia, California. During and immediately after that fundraiser Mr. NITHYANANDA solicited funds from TAYI for that University. GOPAL and SIVA were there at the fundraiser and also solicited funds from TAYI for the University, based on these same representations.

102.   Between September 1 and 11, 2007, TAYI was in India at the premises where the defendant TRUST was located and was again asked by SIVA and GOPAL for contributions to NITHYANANDA FOUNDATION. They repeated the same representations they and Mr. NITHYANANDA had earlier made.

103.   TAYI was told by GOPAL and other representatives of NITHYANDANDA ORGANIZATION that the University had been inaugurated at Montclair, California in October, 2007.

104.   In 2008, TAYI went on a Himalaya trip with Mr. NITYANANDA, GOPAL and SIVA. During the bus journey, SIVA sat next to TAYI and described how SIVA gave away all his wealth to Mr. NITHYANANDA's foundation and did not have a penny and was living like a monk. When TAYI inquired whether SIVA was exaggerating, SIVA defended his representations and suggested that TAYI too should do the same. SIVA offered to TAYI that all the entities in the ORGANIZATION were run so that no one who created it or ran it benefitted or could benefit.  SIVA assured TAYI that any contribution he made would be used solely for the charitable purpose for which he donated. SIVA said he was himself so satisfied with these protections in place, that he had donated everything he owned to Mr. NITHYANANDA's organization.

105.   On May 19, 2009, TAYI donated $100,000 to Mr. NITHYANANDA's organization for a small scale model of the University which Mr. NITHYANANDA told TAYI in May, 2009 was going to be an "experiment" for helping progress the University at Montclair. TAYI told Mr. NITHYANANDA that the purpose of his $100,000 donation was for the University.  GOPAL was present during that meeting. After TAYI told GOPAL that his contribution was for the University experiment to

help the Montclair University, GOPAL instructed TAYI to insert the name LIFE BLISS FOUNDATION on his check.

106. In March 2010, TAYI learned from newspaper accounts that Mr. NITHYANANDA had large sums of money in bank accounts to which he was a signatory, and owned the land on which his services were offered in India. Between March 2010 and March 2012, TAYI learned that nothing in the form of a University or experiment was built in India. In March 2012, TAYI learned from reading a report by someone in the previous lawsuit (by Mr. Popatlal Savla) that the City of Montclair had never heard from NITHYANANDA FOUNDATION or anyone else about a University being located at the Montclair facility, that the property was not zoned for such usage, it would require a change in the City's General Plan to build a University there, no application had been made to remodel that facility to be suitable for a University, and the only application had been made was to open a Sunday School for children for limited hours on Sunday only.

107. In 2012, TAYI learned from a lawsuit brought by Mr. Popatlal Savla, another donor, that financial records showed revenues for NITHYANANDA FOUNDATION and LIFE BLISS FOUNDATION from programs or workshops or seminars far exceeded the costs to put on programs that they offered. Had TAYI known this, he would not have contributed anything to any of the defendants.

{00037480.DOC}

108.   TAYI would not have contributed anything if he knew the true facts which are set forth above and which are summarized in ¶¶ 159-162, 164 - 195 and 197 - 201.

109.   TAYI is demanding a return of the $10,001 he contributed to NITHYANANDA FOUNDATION on October 17, 2007 and the $3,500 he contributed to LIFE BLISS in 2007, which at 10% interest has accrued $7571.65 in interest through May 25, 2007 and continues to accrue $3.69 in interest per day thereafter; a return of the $6,000 he contributed to LIFE BLISS, the $2,000 he contributed to Nithyananda Vedic Temples and the $3,572 he contributed to Nithyananda Ashrams in 2008, which at 10% interest has accrued $5,167.66 in interest though May 25, 2013 and continues to accrue $3.21 in interest per day thereafter; and $100,000 he contributed to LIFE BLISS, $15,000 he contributed to NDTCC and $5,000 to LIFE BLISS, which at 10% interest has accrued $43,068.85 in interest through May 25, 2007 and continues to accrue $32.87 in interest per day thereafter.

## REPRESENTATIONS AS TO PLAINTIFFS RAMESH BHUTADA & BHUTADA FAMILY FOUNDATION

110.   BHUTADA met Mr. NITHYANANDA, SIVA and GOPAL in August, 2005 in Los Angeles. BHUTADA was told by Defendants SIVA, GOPAL and Mr. NITHYANANDA that they had created Defendant NITHYANANDA FOUNDATION as a non-profit corporation operating under Section 501(c), to ensure that no profit could be derived from the operation of the entity, and no money could

go to any of the insiders or incorporators.    During this meeting, Mr. NITHYANANDA announced that he had given up all material goods, and all he owned was the tunic he was wearing, which was worth 150 Rupees. SIVA was present.   In August 2005, SIVA informed BHUTADA that SIVA had been a senior V.P. in a company based in Oklahoma but had given up that career and donated all of his personal assets to Mr. NITHYANANDA's non-profit because he trusted Mr. NITHYANADA completely with his donations, and that BHUTADA should too.  At that first meeting in Los Angeles in August 2005, GOPAL told BHUTADA he had a big I.T consulting company and had visited Houston on occasion to visit his clients, but he too was in the process of giving up his business and was giving all of his assets to Mr. NITYANANDA's non-profit.  Relying on their representations, BHUTADA gave a personal check of $10,000 on October 1, 2005 in Los Angeles to SIVA drawn to NITHYANANDA FOUNDATION.

111.   At a meeting BHUTADA attended in August 2005 in Los Angeles at NITHYANANDA FOUNDATION's Duarte facility, where SIVA and GOPAL were both present, Mr. NITHYANANDA mentioned that all money collected in the U.S. by any entity in the U.S. in the NITHYANANDA ORGANIZATION would stay in the U.S. for charitable work here, and would not be sent to India.

112.   BHUTADA met Mr. NITHYANANDA in December 2005 in India.   Mr. NITHYANANDA, on his own, volunteered to BHUTADA "I don't own anything"

and "my needs are very limited. My clothing costs are Rs 150", which Mr. NITHYANANDA himself converted into "$2 US."

113. SIVA called BHUTADA in January 2006 to solicit another donation, and BHUTADA FAMILY FOUNDATION issued a check for $67,000 on January 23, 2006 to NITHYANANDA FOUNDATION.

114. In March/April 2006, Mr. NITHYANANDA along with SIVA and GOPAL stayed in BHUTADA's home in Houston. Again, each of the Individual Defendants repeated the representations they had made about the non-profit, and asked BHUTADA to contribute more.

115. In March/April 2007, BHUTADA was invited to travel from Houston to Los Angeles to attend a fundraising meeting for a proposed University. SIVA telephoned BHUTADA to invite him to come. BHUTADA flew from Houston to attend the meeting which occurred at the Duarte facility of NITHYANADA FOUNDATION. SIVA and GOPAL were there in addition to Mr. NITHYANADA. They repeated their earlier representations, and this time announced that the non-profit's priority was to build a University in Southern California. On May 11, 2007, BHUTADA FOUNDATION gave a check for $6,100, and GOPAL who was present in Houston then advised BHUTADA to have that check issued to LIFE BLISS FOUNDATION.

116. In October 2007, the Houston Coordinator for NITHYANADA ORGANIZATION, Prakash Morolia, telephoned BHUTADA to advise that SIVA

told him Mr. NITHYANANDA wanted a contribution of $250,000 from the BHUTADA FOUNDATION for their University project and it was urgent because they wanted to buy (or had just bought) the Property for it in Montclair, California. On October 10, 2007, BHUTADA caused BHUTADA FAMILY FOUNDATION to wire-transfer $250,000 to NITHYANANDA FOUNDATION in California for the University project, and Prakash Morolia told SIVA it was for the University project.

117.    Mr. NITHYANANDA represented to BHUTADA that he personally managed all the donations and strictly ensured that no insider would receive anything of value.

118. NITHYANANDA ORGANIZATION had a person named Priyalakshmi Jayapal ask BHUTADA repeatedly for assistance in learning about the import and export business. Very soon, Mr. Morolia established a customhouse broker for NITHYANANDA ORGANIZATION which arranged for the shipping into the U.S. of statues being imported from India.   Mr. Morolia helped NITHYANANDA ORGANIZATION arrange shipping within the U.S.  Mr. Morolia told BHUTADA that all statues imported through this arrangement would be sold by any entity in the ORGANIZATION to the public at cost, and not at a profit.

119.  BHUTADA relied in part on these representations to make any donations for himself   or   BHUTADA   FAMILY   FOUNDATION   to   NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION.  In 2012, BHUTADA learned from a lawsuit brought by Mr. Popatlal Savla, another donor, that financial records

showed that large amounts had been transferred from these two entities to India. Had BHUTADA known this would occur, he would not have contributed anything personally or on behalf of BHUTADA FAMILY FOUNDATION to either NITHYANADA FOUNDATION or LIFE BLISS FOUNDATION. Nor would BHUTADA or BHUTADA FAMILY FOUNDATION have contributed anything if they knew any of the facts set forth above and which are summarized in ¶¶ 159-162, 164 - 195 and 197 - 201.

120.   BHUTADA contributed $10,000 on October 1, 2005, which at 10% interest has accrued $7,652.05 in interest through May 25, 2013, and continues to accrue $2.73 in interest per day; and BHUTADA FAMILY FOUNDATION contributed $67,000 on January 26, 2007, which at 10% has accrued $49,121.09 through May 25, 2013 and $18.35 per day thereafter; $6,000 on May 11, 2007 which at 10% had accrued $3,626.30 through May 25, 2013 and accrues $1.64 per day thereafter; and $250,000 on October 10, 2007, which at 10% has accrued $140,684.93 through May 25, 2013 and accrues $68.49 per day thereafter.

### REPRESENTATIONS AS TO PLAINTIFF NEIL CARMAN

121.   In August of 2006, NITHYANANDA FOUNDATION had a weekend program in Duarte, California. CARMAN flew out for that weekend and met Mr. NITHYANANDA. Before Mr. NITHYANANDA entered the meeting room, GOPAL entered and gave an introduction about the life and history of Mr. NITHYANANDA.

GOPAL emphasized that Mr. NITHYANANADA had no possessions, didn't want anything material, had forsaken everything, and was the best person to open and run a non-profit. GOPAL said that he knew Mr. NITHYANANDA's statements to be true because he lived with Mr. NITHYANANDA in Duarte California when Mr. NITHYHANANDA was here in California and lived with him in India, and could vouch for the truth. GOPAL explained that Mr. NITHYANANDA slept on a mat, and owned nothing.   GOPAL related that even when coming through Customs, Mr. NITHYANANDA had to explain he had no cash, and somebody accompanying Mr. NITHYANANDA would have to pay his Customs charges. GOPAL explained this so impressed him that he had decided to give up his career in I.T. and his successful company in the Bay area and volunteer exclusively for Mr. NITHYANANDA doing charity work. During CARMAN's August 2006 stay in Los Angeles, he observed GOPAL was constantly interacting with Mr. NITHYANANDA. Mr. NITHYANADA assured everyone in public meetings that even though he lived in India, any donations made by anyone in the U.S. would be used solely in the U.S. and would not be sent to India.

122.   In March 2007, CARMAN was back out in Duarte, California for several different weekend and week day programs. GOPAL talked with CARMAN often. He encouraged CARMAN to donate generously to Mr. NITHYANANDA's non-profit. GOPAL repeated the representations about Mr. NITHYANANDA having walked

away from everything material to run his non-profit, and owning nothing and wanting

nothing. GOPAL assured CARMAN any donations to the non-profit would stay in

the U.S. GOPAL assured CARMAN not a penny donated was spent on any founder,

insider, or family member.

123.   In August 2006, CARMAN attended meetings in Duarte, California where

donations were solicited and CARMAN was informed by Mr. NITHYANANDA and

GOPAL at these meetings that the all money collected by NITHYANANDA

FOUNDATION and any other entity in the U.S. controlled by Mr.

NITHYANANANDA would stay in the U.S. for charitable work here in the U.S. In

March 2007, in Duarte, California, Mr. NITHYANANDA and SIVA repeated this

representation at meetings which CARMAN attended where donations were

solicited.   SIVA repeated this representation to CARMAN in April 2007 regarding

LIFE BLISS FOUNDATION.

124.   CARMAN relied, in part, on these representations to make any donations to

any entity to which the Defendants directed he make his donations including but not

limited to NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION.   In

2012, CARMAN learned from a lawsuit filed by Mr. Popatlal Savla, another donor,

that financial records showed that large amounts had been transferred from these two

entities to India. Had CARMAN known this would occur, he would not have

contributed anything to NITHYANADA FOUNDATION or LIFE BLISS

{00037480.DOC}

FOUNDATION or to any other entity to which he was directed by SIVA, GOPAL and other Coordinators of the Defendants such as Mr. Balaji Santharam to which to make his payments.

125. CARMAN attended meetings in August 2006 in Duarte, California, where CARMAN heard Mr. NITHYANANDA and SIVA announce that all the programs, workshops, speaker series, and sales of audio or print materials offered by or through NITHYANANDA FOUNDATION were and would be only offered to the public at cost. Mr. NITHYANANDA stressed at these meetings that CARMAN attended that charges for a particular program were designed simply to cover the Foundation's expenses for that program, and were not set to make any profit.  SIVA and GOPAL repeated these representations at meetings that CARMAN attended in March 2007 in California.

126. In April 2007, SIVA and GOPAL and Mr. NITHYANANDA informed CARMAN that the above remained true for programs, workshops and publications being offered by LIFE BLISS FOUNDATION and several other NITHYANANDA entities (e.g. NITHYANANDA DHYANAPEETAM of Ohio or Seattle or Houston or Columbus) in various cities in the U.S.

127. CARMAN relied in part on these representations in deciding to contribute anything to NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION or

NDTCC or to any other entity to which the Defendants directed him to write his checks.

128.   In 2012, CARMAN learned from a lawsuit brought by Mr. Popatlal Savla, another donor, that revenues collected by NITHYANANDA FOUNDATION and LIFE BLISS FOUNDATION for programs or workshops far exceeded the costs to put on those programs.  Had CARMAN known this, he would not have contributed anything to any of the defendants.

129. In January, April, May and July 2007 and in April and May 2009, CARMAN was specifically directed by Defendants SIVA and GOPAL and on some occasions by Mr. Balaji Santharam, a local Coordinator in the Los Angeles area, which name to insert on the checks which CARMAN intended for NITHYANADA FOUNDATION.  With regard to the check for $1008 made out to "Nithyananda Dhyanapeetum of San Jose" in April 2009, CARMAN was specifically directed by Mr. Balaji Santaram to write that name on that payment instead of other entities such as LIFE BLISS FOUNDATION or NDTCC or Nityananda Dhyanapeetum Charitable Trust.  Each of the names appearing in paragraph 138 below that was a recipient of CARMAN's specific payments is a name that these individuals instructed to CARMAN to insert on his checks.

130.   In April 2007, Mr. NITHYANANDA having an event in Columbus, Ohio, then Oklahoma City, and also in Houston.  CARMAN saw Mr. NITHYANANDA in

{00037480.DOC}

Columbus, Ohio. CARMAN also met SIVA in Columbus, Ohio, and again in Oklahoma City, and later at the Houston meeting. Each time SIVA represented to CARMAN that SIVA and his wife had lived with Mr. NITHYANANDA in India, knew he had given up everything material and didn't want any material things, and for that reason alone CARMAN should consider donating to Mr. NITHYANANDA's non-profit, rather than to any other non-profit. SIVA volunteered to CARMAN in April 2007 that, like GOPAL, he too had walked away from a successful business career. SIVA represented he was a V.P. of a company in Oklahoma before leaving to work for the non-profit, and told CARMAN that SIVA and his wife Ragini had "laid all of their assets at [Mr. NITHYANANDA's] feet" and donated it to his organization, and CARMAN should consider doing the same.

131.  CARMAN, who has taught at the University of Texas, was invited by Mr. NITHYANANDA and NITHYANANDA FOUNDATION to come from Austin, Texas to attend programs and a meeting in the Los Angeles area in or about March 2007 to discuss a proposed University in California. In the two hours CARMAN was at the March preliminary meeting, CARMAN saw Mr. NITHYANANDA completely in charge. Mr. NITHYANANDA sat down in a chair directly up front in the small room, quickly said "I'm in charge of the meeting" or something to that effect, said he was "just a village boy" as he was introducing himself, and then stressed that he wanted nothing for himself, had forsaken everything material to prevent any misuse

of donated funds he personally controlled any expenditure from his non-profit, and assured those present that neither he nor anybody associated with his organization would benefit a single cent from any funds if anyone at that meeting donated anything.

132.   CARMAN observed Mr. NITHYANANDA had invited a number of academics --like CARMAN--and high net worth individuals to the event. Mr. NITHYANANDA asked each individual present to identify him or herself and explain how they were going to contribute to his new University. Mr. NITHYANANDA strongly encouraged those present to help him raise the large amounts of funds needed for the University.  As CARMAN recalls it, that March 2007 meeting was a pure fundraising event.

133.   During that March 2007 event, Mr. NITHYANANDA asked how quickly this University could start operation. CARMAN recalled Mr. NITHYANANDA said he wanted it up and running up the end of that year, which CARMAN understood would be December 2007. When some participants proposed a longer schedule, Mr. NITHYANANDA intervened and insisted he wanted at least the initial phase of the University up and running by the end of 2007. Mr. NITHYANANDA specifically said he wanted a facility where courses at the University level would be held, not classes that can be taken from somebody's home, and said it needed to be accredited for higher education. SIVA and GOPAL were both there, hearing all of these

{00037480.DOC}

representations, and openly assisting Mr. NITHYANANDA. During the meeting both SIVA and GOPAL repeated Mr. NITHYANANDA's representations of him having forsaken everything, owning nothing, wanting nothing for himself, and represented Mr. NITHYANANDA would exercise the most stringent control over any expenditures of the non-profit as the best possible protection for donors. SIVA and GOPAL informed those present at that meeting that they themselves had donated all of their personal assets to Mr. NITHYANANDA's non-profit. Mr. NITHYANANDA assured everyone that donations given for the University would be earmarked for just that project, nothing else.

134.   In late May 2007, CARMAN met Mr. NITHYANANDA and he asked CARMAN to be the Coordinator of his center in Austin, Texas.  SIVA and GOPAL were aware of this request, and they explained to CARMAN that there were multiple entities in NITHYANANDA ORGANIZATION including the TRUST in India which is a named Defendant in this case, but all were run and tightly controlled by Mr. NITHYANANDA, SIVA and GOPAL as  one entity.

135.   CARMAN took a trip to Cambodia for a week in July 2007 with Mr. NITHYANANDA.  SIVA was on the trip, and during that trip he said the very same things about Mr. NITHYANANDA and how his non-profits operated and repeated all of the safeguards.   During that trip, Mr. NITHYANANDA asked CARMAN to

{00037480.DOC}

become a monthly contributor to "the organization." It was clear to CARMAN that the trip was first and foremost a fundraising trip.

136. Sometime in late 2007, CARMAN met Mr. NITHYANANDA at the Montclair facility--after CARMAN knew that Mr. NITHYANANDA had announced publicly the inauguration of the University at Montclair--and gave him a copy of CARMAN's course materials, and Mr. NITHYANANDA said to CARMAN "Come to Montclair and teach your course" after the building is remodeled to operate as a University. GOPAL was present at that meeting.

137. In 2007, CARMAN donated $26,080 to Mr. NITHYANANDA's organization. CARMAN was told by Mr. Balaji Santharam, a local Coordinator in the Los Angeles area, which name to insert on the checks, and it differed many times. CARMAN observed that Balaji and his wife Priyalakshmi were both involved in the accounting for all these various entities including NITHYANANDA FOUNDATION, LIFE BLISS and NDTCC, which were all operating out of the same location with the same personnel. It appeared to CARMAN from their actions that they were all operating as one.

138. CARMAN made the following contributions:

TOTAL $20,000 - Nithyananda Foundation

Nithyananda Foundation $20,000 total paid in four checks in April 30, 2007 (2 checks) and June 30, 2007 (2 checks).

{00037480.DOC}

<u>TOTAL $6,016 Life Bliss Foundation</u>

Life Bliss Foundation $1008 in January 24, 2007.

Life Bliss Foundation $1008 in November 30, 2009.

Life Bliss Foundation $600 in March 7, 2007.

Life Bliss Foundation $600 in April 20, 2007.

Life Bliss Foundation $600 in April 27, 2007.

Life Bliss Foundation $200 in May 12, 2007.

Life Bliss Foundation $1000 in November 30, 2007.

Life Bliss Foundation $500 in August 29, 2007.

Life Bliss Foundation $500 in August 6, 2007.

<u>TOTAL $1,008 Nithyananda Dhyanapeetum of San Jose</u>

Nithyananda Dhyanapeetum of San Jose $1008 on April 20, 2009.

<u>TOTAL $6,000 Dhyanapeetum Charitable Trust</u>

Dhyanapeetum Charitable Trust $3,000 on May 4, 2009.

Dhyanapeetum Charitable Trust $3,000 on May 22, 2009.

<u>TOTAL $12,096.00 Nithyananda Dhyanapeetum Temple & Cultural Center</u>

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on January 22, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on January 22, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on February 28, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on May 6, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on May 19, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on June 22, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on July 13, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on August 7, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on September 8, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on November 20, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on November 20, 2009.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on December 3, 2009.

TOTAL $13,104.00 Nithyananda Dhyanapeetum Temple & Cultural Center

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on January 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on January 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on February 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on March 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on April 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on May 7, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on June 9, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on July 14, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on August 11, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on September 14, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on November 4, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on December 1, 2008.

Nithyananda Dhyanapeetum Temple & Cultural Center $1008 on December 30, 2008.

139.   CARMAN would not have contributed anything if he knew the true facts which are set forth above and summarized in ¶¶ 159-162, 164-195 and 197-201.

140.   On October 8, 2010, CARMAN demanded a refund of these amounts which he contributed to various entities in NITHYANANDA ORGANIZATION. The Defendants refused to return anything.  At the rate of 10% from December 3, 2009, $20,242.80 in interest has accrued through May 25, 2013, and continues to accrue at the rate of $15.95 per day.

## REPRESENTATIONS AS TO PLAINTIFF HITTEN DALAL

141.   DALAL met Mr. NITHYANANDA in 2006.  Thereafter, DALAL started to receive communications from NITHYANANDANA FOUNDATION.  DALAL met SIVA in 2006 and 2007 and 2008, and perhaps 2009, and met GOPAL in every year between 2006 and 2010.

142.   From 2006 through 2009, Mr. NITHYANDANDA, GOPAL and SIVA each told DALAL in Duarte, California, and in Montclair, California, on multiple occasions too frequent to recall that Mr. NITHYANANDA owned nothing, had forsaken all material possessions, and was the perfect person to manage the various entities in Mr. NITHYANANDA's non-profit organization as he didn't want anything himself, in fact had renounced everything material, and with that mindset, it was Mr. NITHYANANDA who personally reviewed all of the expenditures of all entities in his organization and he absolutely would not permit any diversion of funds

or misuse by insiders of any donations. DALAL heard Mr. NITHYANANDA himself announce often that he only owned two pieces of clothing toiletries and sandals, nothing else.

143.   In 2008, Mr. NITHYANANDA told DALAL and several other persons at an event in India that all he owned was two pair of clothes and basic toiletries and that his expenses were a bare minimum, and that he did not have any possessions.   Mr. NITHYANANDA identified to DALAL and everyone else present at the event that the annual cost of Mr. NITHYANANDA's wardrobe--which he said consisted of two tunics, one to wear and the other to wash--was a couple of hundred rupees, which is about $2-4 US Dollars. Mr. NITHYANANDA volunteered to those present including DALAL that the monthly cost of Mr. NITHYANANDA's toiletries was about ten Indian rupees. This is about twenty cents in the U.S. Mr. NITHYANANDA's exact description to DALAL and the others present with regard to all the toiletries he possessed was a soap bar to take a shower, and a toothbrush.

144.   When DALAL was in India, Mr. NITHYANANDA represented at meetings attended by DALAL and many others that the land on which he held meetings was donated to the ORGANIZATION's Indian Foundation which is the TRUST that is a Defendant in this case.

145.   In 2006, DALAL attended meetings in Duarte, California where he heard Mr. NITHYANANDA and GOPAL announce that the all money collected by any entity

in the U.S. controlled by Mr. NITHYANANDA would stay in the U.S. In 2007, in Duarte, California, DALAL heard Mr. NITHYANANDA and SIVA and GOPAL repeat this representation regarding LIFE BLISS FOUNDATION as well. DALAL relied in part on these representations to make any donations to any entity to which the Defendants directed he make his donations to including but not limited to NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION.

146. In 2012, DALAL learned from the litigation brought by Mr. Popatlal Savla, another donor, that financial records of these entities showed that large amounts had been transferred from entities such as NITHYANANDA FOUNDATION and LIFE BLISS FOUNDATION to India. Had DALAL known this would occur, or was occurring, he would not have contributed anything to either NITHYANADA FOUNDATION or LIFE BLISS FOUNDATION or to any of the other entities such as "Nithyananda Sacred Arts" or "Nithyananda Anna Mandir" or "Nithyenanda Dhyanapeetam" which are names of entities that DALAL was instructed by GOPAL or his wife Mrs. Jyothi Sheelum, or Mr. Balaji Santharam, or Mr. Sreraman Narasiman or Mr. Raj Krishnan (all of whom were Managers or Coordinators of the Duarte and then the Montclair facility) to which to make his contributions.

147. DALAL attended meetings in 2006 in Los Angeles, California where he heard Mr. NITHYANANDA and SIVA in Duarte, California, announce that all the programs, workshops, speaker series, and sales of audio or print materials offered by

or through NITHYANANDA FOUNDATION or its Store (Ananda Galleria) were and would only offered to the public at cost. GOPAL explained during these meetings that charges for a particular program were designed to cover the Foundation's expenses for that program, and were not set to make any profit. SIVA and GOPAL repeated these representations in meetings in 2007 in California that DALAL attended. They stressed this rule applied to all workshops and programs of all of the entities in the ORGANIZATION, which SIVA and GOPAL explained in these meetings that DALAL attended were being jointly managed and controlled 100% by Mr. NITHYANANDA, with the assistance of GOPAL and SIVA.

148.   In May 2008, GOPAL's wife Jyothi Sheelum, also a manager at the Montclair premises and a managing agent of NITHYANANDA FOUNDATION, LIFE BLISS FOUNDATION and NDTCC, assured DALAL that all programs workshops, services and sales from any entity in the organization had to be priced at cost.

149.   DALAL relied in part on these representations in deciding to contribute anything to NITHYANANDA FOUNDATION or LIFE BLISS FOUNDATION or NDTCC or to any of the other entities to which GOPAL, Mrs. Sheelum (GOPAL's wife and the Manager of the Store) or Mr. Balaji Santharam or Mr. Srereman Narasiman (all Managers or Local Coordinators of the Duarte and then the Montclair facility) directed DALAL to write his checks.

150.   In 2012, DALAL learned from the litigation brought by Mr. Popatlal Savla, another donor, that financial records of these entities showed that in many years revenues for NITHYANANDA FOUNDATION and LIFE BLISS FOUNDATION far exceeded the costs to put on programs that they offered. Had DALAL known this, he would not have contributed anything to any of the defendants.

151.   DALAL volunteered his services as an engineer to NITHYANANDA ORGANIZATION in Montclair about six months after the Montclair facility had opened, which was sometime in mid-2008. DALAL and his wife, as monthly contributors, were given a special tour of the facility and were told on the tour that the Montclair location was going to be remodeled as the campus for a University. DALAL was asked by Mr. Sreraman Narasiman, a local Coordinator the NITHYANANDA ORGANIZATION who was one of the persons escorting DALAL around on the tour, to contribute specifically for the University project at the Montclair location.  DALAL was given a tour of the unused area of the Montclair, facility and asked to contribute funds to complete the construction/remodel for there to be classes for the University at the Montclair facility. DALAL, who was a project manager in his career, volunteered his services to estimate and be involved in the design process of the electrical and control systems for the construction.

152.   It was not just DALAL and his wife on the tour. This was an evening meeting for the monthly contributors' families, and all of them were given the tour of the

facility and told the specific purpose was to raise funds for the completion of the construction of the University at the Montclair site.   This was not a tour for the temple, but it was a tour for the University.

153.   A couple of times in 2008 and 2009 at these meetings of the monthly contributors, SIVA asked DALAL to contribute to the University, and a couple of times GOPAL asked DALAL to contribute to the University. SIVA and GOPAL did not make this pitch only to DALAL but to all of those present, who DALAL understood to be monthly contributors. DALAL was told by the organization's local administrative head, Mr. Sreraman Narasiman, in mid-2008 that NITHYANANDA FOUNDATION had applied for permits from the City of Montclair to commence the remodel and it would take about a year to get those permits. DALAL was told those permits were to remodel the Montclair facility in order to build the University on that facility, or to construct the University on the Montclair Property. SIVA and GOPAL thanked DALAL for volunteering his engineering services, and told him they would get back to him.

154.   At the Montclair facility, GOPAL's wife Jyothi Sheelum managed the "Ananda Galleria" store. On May 17, 2008, DALAL was charged $19,900 for seven statues which GOPAL's wife assured DALAL was the ORGANIZATION's cost price, with no added profit. GOPAL's wife represented to DALAL that all services and sales from the ORGANIZATION had to be priced at cost, because they were a

{00037480.DOC}

non-profit. GOPAL's wife instructed DALAL to write his check to "Nithyananda Sacred Arts," and he did so. DALAL found out in 2011, that the statues, inclusive of shipping and handling costs to the U.S., cost the organization about $2,200, not $19,900.

155. Throughout DALAL's dealings with Mr. NITHYANANDA, SIVA and GOPAL from 2006 through March 2010, they told DALAL all of the entities in the ORGANIZATION were one and the same, and so, whether DALAL was dealing with NITHYANADANDA FOUNDATION, LIFE BLISS or NDTCC or any other name such as "Nithyananda Sacred Arts" or "Nithyananda Anna Mandir" or "Nithyenanda Dhynapeetam" DALAL was led to believe they were the same entity. Whenever DALAL would write a check, the ORGANIZATION's personnel such as Jyothi (GOPAL's wife), SIVA, Sreraman, or Mr. Raj Krishnan, would tell DALAL which entity to write the check. DALAL did not select the entity on the check, the ORGANIZATION's personnel did, and it differed at different times. DALAL, along with his wife, also contributed monthly, and received e-mails telling them that their credit card account was billed by "Nithyananda Dhynapeetam."

DALAL visited the Montclair facility in March 2010, and heard GOPAL and Mr. NITHYANANDA on a telephone conference call which was broadcast on a speakerphone, for everyone in the Montclair assembly to hear. At that time, GOPAL was with Mr. NITHYANANDA and both of them were making the decisions for the

Montclair facility. DALAL witnessed that it appeared that everybody in the audience knew Mr. NITHYANANDA and GOPAL had all of the power to make all decisions for the ORGANIZATION in Montclair.

156.   DALAL would not have contributed anything if he knew the true facts which are set forth above and summarized in ¶¶ 159-162, 164 - 195 and 197 - 201.

157.   Receipts for donations mailed to DALAL and his wife showed they contributed $501 in 2007, $9465 in 2008 and $10,451 in 2009. 26 of the receipts are from NDTCC, one from NITHYANANDA FOUNDATION, and one from Nithyananda Anna Mandir. All three of the names on the receipts have the same address of 9720 Central Avenue, Montclair, CA 91763.

158.   DALAL is demanding a return of the $19,990 he paid for the statues and interest of 10% interest thereon from May 17, 2008 to May 25, 2013 is $9988.16 and is accruing interest at the rate of $5.45 per day thereafter; and the $20,417 in contributions and interest at 10% interest thereon from through May 25, 2013 which is $6,930.59 and is accruing interest at the rate of $5.59 per day.

159.   From 2005-August 2009, Plaintiffs were led by Mr. NITHYANANDA and GOPAL and SIVA  to believe--and reasonably believed--that each entity that these three Individual Defendants caused to be incorporated in the U.S., and the TRUST in India: (1) did not seek to make profits, (2) did not operate for the benefit of the personal or private interests of its leader or founders or anyone else, (3) were not

conducting a trade or business, (4) that Mr. NITHYANANDA owned nothing, had forsaken all material goods, and would not benefit from any of the donations to the non-profit entities, (5) all programs and workshops would be priced at cost and with no markup, (6) that SIVA and GOPAL were successful businessmen with substantial assets who had themselves given all of their wealth and assets to the non-profits as proof of their confidence in Mr. NITHYANANDA's stewardship of the non-profits, and (7) (as to all Plaintiffs, except SHINDE) none of the money collected in the U.S. by the ORGANIZATION would be sent to India,. The three Individual Defendants made these representations to convince Plaintiffs that Mr. NITHYANANDA had no proclivity or motive to misuse donations they made to the non-profits. They said these things to make it more likely that Plaintiffs should donate, and donate larger sums. These misrepresentations were all part of the continuing charade by these Individual Defendants to fool Plaintiffs into making donations.

160. Each Defendant's misrepresentations and/or concealment of material facts contributed to leading Plaintiffs to believe that (1) each entity in NITHYANANDA ORGANIZATION was not seeking to or making any profits, not operating a trade of business, not operating for the benefit of any individuals including its founder Mr. NITHYANANDA, and would not spend Plaintiffs' contributions other than for the specific purpose for which they were designated when given, and (2) Mr. NITHYANANDA had forsaken all material goods and possessions, did not own

anything, did not want to acquire anything, had certain qualifications that SIVA and GOPAL vouched for and offered to assure Plaintiffs that Mr. NITHYANANDA would be a proper steward for the non-profits and to ensure Plaintiffs' contributions were spent exclusively for the purpose for which they had been contributed.

161.   In actuality, (A) each of the Defendants participated in a fraudulent scheme to solicit Plaintiffs' contributions based on false promises of how the contributions would be used, with no intention of using them for the purpose for which they were solicited and for which the Plaintiffs had designated their use, cannot account for how they spent the funds, transferred large amounts to the control of the founder (in India), (B) then secretly stripped each entity in NITHYANANDA ORGANIZATION and the alter ego entities of their assets to avoid paying creditors such as Plaintiffs; and (C) each of the Defendants knowingly ratified, endorsed and adopted and then concealed from Plaintiffs the fraudulent conduct of the Defendants, including NITHYANANDA ORGANIZATION'S leader, Mr. NITHYANANDA.

162.   In justifiable reliance on each of the Defendants' representations, Plaintiffs made the aforementioned contributions to the entities in NITHYANANDA ORGANIZATION.

163.   To transfer funds from Plaintiffs' bank accounts into entities which are defendants named herein, each of the Individual Defendants' aforementioned

representations caused electronic wire transfers across state lines to be used, and in many instances the mail to be used, such as to mail checks.

## DEFENDANTS' FRAUD AND DECEIT IS EXPOSED

164.   Plaintiffs did not learn about Defendants' misrepresentations and concealments until late March 2010 after Mr. NITHYANANDA himself personally admitted to Plaintiff SHINDE and to others, that from early on, commencing in 2004, Mr. NITHYANANDA was acquiring vast holdings of land in India, and most of the money contributed in the United States was sent to India to Mr. NITHYANANDA's control.

165.   Plaintiffs learned in 2012 that Mr. NITHYANANDA admitted to another contributor, Popatlal Savla, that there was never any plan to build a University in Montclair, California.

166.   Plaintiffs learned in early 2012 that Bob Gutzman, a real estate appraiser in Los Angeles retained by Mr. Savla to check with the City of Montclair about the status of the University spoke with Silvia Gutierrez and Michael Diaz, both City of Montclair Planners, who informed him that universities and schools are not permitted in the zone where NITHYANANA FOUNDATION's Property is located, they are not even allowed with a Conditional Use Permit, nobody from or on behalf of the Defendants had ever approached the City from 2006 to the first quarter of 2012 about the possibility of a University at this location, and if they did, the City would have said a

zone change would not be allowed because that would be "spot" zoning which would conflict with the City's General Plan.

167. Although Plaintiffs learned that NITHYANANDA FOUNDATION had applied for a Conditional Use Permit for this Property, that permit was solely to run a Sunday school program only, which was approved on January 2011, strictly for a three hour Sunday morning program.   It is not an approval for a University. Defendants deliberately misrepresented to Plaintiffs the true nature of their request to the City.

168. In and after March 2010, Plaintiffs also learned from newspaper reports that Mr. NITHYANANDA owned enormous assets in India, both land and money in bank accounts over which he had control.

169. In March and April 2010, a former contributor, Popatlal Savla, confronted Mr. NITHYANANDA via the telephone with this information of the ownership of land in India on which entities such as Defendant TRUST operated, and Mr. NITHYANANDA admitted the land in India was in his own name, not in   any charitable entity's name. In an attempt to cover up his previous lie, Mr. NITHYANANDA told yet another lie, stating that the donor of the Indian land refused to give the land to any charitable foundation so Mr. NITHYANANDA was forced to accept ownership of it in his own name. Plaintiffs subsequently found out that there was no donor of the Indian land.   On the contrary, Mr. NITHYANANDA

purchased the land. Kishen Reddy, a one-time insider in NITHYANANDA ORGANIZATION, valued the land at $ 5 million.

170. In late 2010, and thereafter, Plaintiffs also learned that--on November 26, 2007--Mr. NITHYANANDA had started two hedge funds (Nithyananda Capital and Nithyananda Investment) as well as an investment company (Nithya Advisors, LLC) in Florida, ostensibly through Defendant SIVA, and that Mr. NITHYANANDA and SIVA were each identified in an April 8, 2008 Amendment to its Articles of Incorporation and it its 2009 Limited Liability Company Annual Report filed January 27, 2009 as a Managing Member/Manager. Plaintiffs learned that U.S. non-profits needed to include the activities of all related entities under the same management.

171. Plaintiffs learned in 2012 that NITHYANANDA FOUNDATION, LIFE BLISS and NDTCC were not properly operating as non-profits, as had been misrepresented to Plaintiffs.

172. Beginning in late 2010 and thereafter, Plaintiffs discovered that NITHYANANDA ORGANIZATION paid for all of the lodging costs of Mr. NITHYANANDA and the Individual Defendants when they stayed on Mr. NITHYANANDA's premises in India and when they traveled elsewhere, and that Defendant LIFE BLISS had revenues of $2,693,322 in the 2007 tax year, but only $394,929 in expenses.   This latter detail informed Plaintiffs that entities in NITHYANANDA ORGANIZATION were not charging for services at cost. Yet,

from the beginning, the IRS had told NITHYANANDA FOUNDATION it was concerned about the "Foundation's basis used in determining the sales price" of the products, and on September 24, 2004 asked NITHYANANDA FOUNDATION to "state how your publishing activities are distinguishable from those of a for-profit enterprise". Defendant SIVA wrote back on behalf of NITHYANANDA FOUNDATION: "These books are sold at cost, which is inclusive of printing and shipping costs…. This is how our publishing activities differ from a for profit organization." Plaintiffs learned that between 2005-2010 the non-profit entities entities in the U.S. --under the control of the Individual Defendants--charged huge sums for programs such as "Atma Spurana." Defendant NITHYANADA FOUNDATION's annual information tax return for 2007, shows total revenue for the year of $2,693,322 but only $201,078 devoted to program services. Defendant NITHYANANDA FOUNDATION's cumulative P&L shows over $5,993,506.87 in "Total Income." Defendants have no records to show what they charged was remotely justified by the cost to produce these programs.

173.   Plaintiffs also learned in 2012 that Defendants NITHYANDA FOUNDATION, LIFE BLISS and NDTCC are unable to account for over $2 million in net revenue as shown on financial documents given in the Popatlal Savla lawsuit. For example, NITHYANANDA FOUNDATION's annual information tax return for 2007 shows total revenue for the year of $2,693,322, but only $201,078 was devoted to program

{00037480.DOC}

services. Plaintiffs learned that the entities in NITHYANANADA ORGANIZATION have no records showing how they spent $3.6 million

174.   Mr. NITHYANANDA admitted in March 2010 to another contributor, Kisen Reddy, an insider in the TRUST, that Mr. NITHYANANDA had $12.5 million in his bank accounts in India, most of it was transferred from the U.S., and nearly $6.5 million had come from entities in NITHYANANDA ORGANIZATION and the rest from other entities in the U.S., Singapore, et cetera.

175.   After March 2010, Plaintiffs learned from Kishan Reddy that Mr. NITHYANNANDA was a signatory of those bank accounts. Mr. Reddy disclosed that not only Mr. NITHYANANDA but GOPAL and SIVA told him of these funds, and in March 2010 all three of them, Mr. NITHYANANDA, GOPAL and SIVA, solicited Mr. Reddy's assistance in unfreezing them.

176.   On information and belief, Plaintiffs allege that since the filing of Defendant NITHYANANDA FOUNDATION's tax return for calendar year 2007, no entity in NITHYANANDA ORGANIZATION has filed a return or submitted a notice for three consecutive years.

177.   Plaintiffs learned in 2011 and 2012 that each Defendant engaged in transactions and other activities (such as the approving the transfer of funds among inter-related entities) and hundreds of thousands of dollars in issuance for so called "grants" to India without supporting documentation.

{00037480.DOC}

178.   In 2011, each of the Plaintiffs also learned from Mr. Kishen Reddy, and then received confirmation from the testimony of SIVA and GOPAL during their depositions in the *Savla* lawsuit, that SIVA and GOPAL and their families had not given all of their assets to non-profit organizations run by Mr. NITHYANANDA, as they had misrepresented to Plaintiffs prior to February 2010, but each owned and continued to acquire substantial real estate assets.

179.   In 2011, Plaintiffs learned that $710,478.96 was transferred by just LIFE BLISS to Mr. NITHYANANDA's brother's company called Nithyananda Imports and Exports, for the purchase of statues and merchandise from India at hugely inflated prices, in an attempt to launder money from LIFE BLISS to Mr. NITHYANANDA's family.

180.   In 2011, Plaintiffs learned that the Houston Coordinator of NITHYANANADA ORGANIZATION, Prakash Morolia, had complained internally that statues--which invoice prices he was seeing as he assisted their import--were being sold to contributors at hugely inflated prices which was inconsistent with the public non-profit representations of the Defendants. He was told by the person in charge of NITHYANANADA ORGANIZATION in Houston, a Mr. Medhananada, that Mr. NITHYANANDA "wanted it that way."  Mr. Morolia next complained internally to SIVA saying NITHYANANDA ORGANIZATION was being "run like a Mafia," and that the internal emphasis on making money and charging more was excessive

{00037480.DOC}

and oppressive. SIVA had full knowledge of these activities, but did not change any of the practices and continued to conceal the truth from Plaintiffs.

181.   In 2011, Plaintiffs learned from another volunteer, Ms. Yamini Nerurkar, who was in charge of the NITHYANANDA ORGANIZATION's Day Care center in Duarte, California, that Mr. NITHYANADNA's approach internally was mixing profit and non-profit activities in managing all of the various entities including LIFE BLISS and NITHYANANDA FOUNDATION. For example, Ms. Nerurkar was first told the Sunday school which she was going to manage through one of the non-profit entities in NITHYANANDA ORGANIZATION was going to be free. Later, Mr. NITHYANANDA himself told her "You have to charge heavily" for the Sunday school being operated through a non-profit in NITHYANANDA ORGANIZATION.

182.   Defendant GOPAL's wife, Jyothi, sold statues for profit from the Ananda Galleria at the Montclair Property, but falsely represented to Plaintiff DALAL they were being sold at cost.   Prakash Moralia, the Houston Coordinator of NITHYANANDA ORGANIZATION noticed it was selling statues it imported "at very inflated prices" and told Defendant SIVA that NITHYANANDA ORGANIZATION "is being run like a Mafia." The Houston Coordinator told Defendant SIVA "the pressure to bring in money is too intense."

183.   In 2011 Plaintiffs learned from Suresh Pillai in Ohio that he was told by SIVA that Defendant NITHYANANDA FOUNDATION and Defendant LIFE BLISS "are

{00037480.DOC}

one and the same", and that Defendant SIVA diverted a 29.1% interest in a start-up company called Rank by Search LLC ("RBS") for his own personal benefit even though that interest was donated by Suresh Pillai to a non-profit entity in NITHYANANDA ORGANIZATION.

184.  In April 2010, Defendants reached an agreement amongst themselves to destroy evidence and strip all of the assets of the three Defendant entities in NITHYANANDA ORGANIZATION and another 12 of the alter ego entities listed in ¶ 33 and fraudulently convey those assets to avoid known liabilities (the "Individual Defendants' New Conspiracy"). *See* Exhibit F. Plaintiffs learned of this scheme only in 2011.

185.  In 2011, Plaintiffs discovered that on April 17, 2010 two of the individual Defendants sent an electronic e-mail communication across state lines, amongst themselves, setting forth the Individual Defendants' agreement to destroy evidence and strip NITHYANANDA ORGANIZATION's entities' assets in order to avoid paying any of their liabilities owed to Plaintiffs and creditors.  A true and correct copy of the April 17, 2010 e-mail is attached as Exhibit F (the "April 17, 2010 e-mail").

186.  On April 13, 2010, Defendant GOPAL sent an e-mail communication across state lines about the structure and risks of the Individual Defendants' New Conspiracy.

187. On April 15, 2010, Defendant GOPAL sent an electronic e-mail communication across state lines requesting his wife and others to send the plan for their changes.

188. On April 16, 2010, Defendant GOPAL received an electronic e-mail communication across states lines highlighting the Individual Defendants' scheme to distribute the assets of the entities of NITHYANANANDA ORGANIZATION and a number of the other interrelated alter ego entities. Defendant GOPAL responded that "the dissolution and distribution plan was very clear and unambiguous" and there was "an agreement in principle on the plan."

189. The April 17, 2010 e-mail was received across state lines by Defendants GOPAL and SIVA. That e-mail summarized the Individual Defendants' New Conspiracy as follows:

    a.    The Individual Defendants would oversee, control and distribute Defendant NITHYANANDA FOUNDATION's assets;

    b.    The Individual Defendants' New Conspiracy describes the Individual Defendants' plan to strip these entities of all of their assets and form new "nonprofits;"

    c.    "Dissolution of the entities was recommended as the cleanest option with the least risk. The best way recommended was to start with a clean slate and it involves the least risk against any lawsuits. Our attorneys

{00037480.DOC}

[have] specifically stated quoting case studies of courts not allowing cases against organizations that have been dissolved;"

    d.    The Individual Defendants' "Distribution Plan" commencing on page 3 and going through page 6 of Exhibit F sets out the Individual Defendants' "Cash Distribution Plan" and "Asset Distribution Plan" for NITHYANANDA ORGANIZATION and a number of the alter egos;

    e.    The Individual Defendants (individually and collectively) treated each of the fifteen entities listed in Exhibit F as one "organization" and internally referred to the collection of these so called non-profits between themselves as "the organization."

190.  On April 21, 2010, Defendants SIVA and GOPAL received an e-mail which noted the Individual Defendants' role of doing "preliminary due diligence" on the plan and bragged that "we have avoided potential legal situations (such as being asked by Bhakta Swami [who is Defendant GOPAL] to refund the donations for some of the donors)…" In this e-mail the Individual Defendants repeated the plan to dissolve the existing entities to "protect [Mr. NITHYANANDA], …and Directors and officers of the organization from being drawn into unwanted and avoidable litigations."

191.  Plaintiffs learned in 2012 that the Individual Defendants themselves benefitted from the three U.S. corporate defendants and the TRUST in India which gave

GOPAL and his wife an apartment in Bidadi, India. GOPAL's wife, Jyothi, never paid for a single residence cost since 2007. SIVA's wife, Ragini, did not pay for her food and lodging from 2005 through January 2012.   All these were paid for by entities in NITHYANANDA ORGANIZATION.

192.   The Individual Defendants knew, by virtue of being incorporators, Directors, and controllers of all these entities that Defendant NITHYANANDA FOUNDATION was required to but did not attribute the revenues of its instrumentalities like Defendant NDTCC and Defendant LIFE BLISS FOUNDATION.   Defendant SIVA was the incorporator of Nithyananda Investments LLC, which he described on the Statement of Information to the California Secretary of State was to "invest in technology and other businesses."   Rather, these defendants abused these rules and deliberately caused one or more entities in NITHYANANDA ORGANIZATION to siphon its assets to other entities, so that Mr. NITHYANANDA could get the money through these other entities.

193.   Defendant   GOPAL   knew   that   an   entity   in   NITHYANANDA ORGANIZATION had given apartments to his mother-in-law and other close insiders in India.

194.     At the time the Individual Defendants made representations to Plaintiffs about the cost of NITHYANANDA ORGANIZATION'S programs, they knew it was supposed to be charging for those services at cost, and was not.

195.     Each of these practices was directly contrary to what NITHYANANDA ORGANIZATION represented to the Plaintiffs in order to get their contributions. Defendants concealed this information from Plaintiffs, in order to cause them to donate to entities in NITHYANANDA ORGANIZATION.

**Defendants' Duty To Speak**

196.     Because the Individual Defendants were acting as NITHYANANDA ORGANIZATION's ostensible agents, knew the truth all along, and knew it was not what was being represented to donors like Plaintiffs, Defendants each had an independent duty to inform Plaintiffs that (1) from the beginning and all along NITHYANANDA ORGANIZATION's intent was to make profits, (2) Mr. NITHYANANDA, the other Individual Defendants, and other insiders would or were personally benefiting from contributions made to entities within NITHYANANDA ORGANIZATION, (3) Defendant NITHYANANDA FOUNDATION was not acting as a separate legal entity but was acting through and with several other instrumentalities such as Defendant NDTCC and Defendant LIFE BLISS FOUNDATION, and not declaring their joint revenues under the IRS' attribution rules, (4) the entities within NITHYANANDA ORGANIZATION were serving a

private interest, (5) the entities in NITHYANANDA ORGANIZATION were benefitting disinterested persons, (6) the entities within NITHYANANDA ORGANIZATION had no adequate accounting of the millions it solicited and collected, most of which it shoveled to Mr. NITHYANANDA in India ostensibly for "construction" projects on land in India, even though the Defendants knew the three U.S. defendants had no land and no infrastructure in India, and (7) only Mr. NITHYANANDA owned that land, and neither he nor GOPAL nor SIVA had abandoned all their wealth and assets or given them all to the organization.

### Plaintiffs' Justifiable/Detrimental Reliance and Damages

197.   Plaintiffs' reliance was reasonable in light of the fact that Defendants knew but concealed (1) were making huge payments which personally benefited insiders such as Mr. NITHYANANDA, and separately benefitted each of Individual Defendants; (2) was serving a private interest and benefitting  private persons; (3) were operating as one entity, and not attributing their revenues, and actually sought profits and siphoned out assets; (4) were led by Mr. NITHYANANDA, who had not renounced material possessions but instead owned property and vast cash assets, as did SIVA and GOPAL; (5) had inadequate accounting records to explain how they spent the millions donated to them; and (6) had no intention to build a University in Montclair, California, for which over $600,000 was contributed by the Plaintiffs.

198.   In justifiable reliance on Defendants' misrepresentations, concealment and aforementioned conduct, Plaintiffs made contributions as set out above.

199.   Plaintiffs had no reason to anticipate that the three Individual Defendants and the four entity Defendants and their ostensible agents would lie and intentionally misrepresent and conceal material facts.  Had Plaintiffs known the true facts on any of these topics Plaintiffs would have never made any payments to any of the three entities.

200.   Plaintiffs did not learn about any of these misrepresentations and concealments until mid to late March 2010 at the earliest.

201.   In doing the acts alleged, each of the three Individual Defendants and each of the four entity Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs, and therefore Plaintiffs are entitled to punitive damages in an amount according to proof at the time of trial.  Absent punitive damages, each of the three U.S. corporate entities, the TRUST in India, and the Individual Defendants will have no disincentive to engage in this oppressive, fraudulent and malicious conduct again.

## SECOND CAUSE OF ACTION
## CIVIL CONSPIRACY
### [Against All Individual Defendants and DOES 1-10]

202.   Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

203.   At various times and places, each of the Individual Defendants had knowledge of--and agreed to--defraud Plaintiffs by providing them with false information (and concealing material facts) thereby inducing Plaintiffs to contribute large sums of money based on that dishonest information.

204.   From 2005 to 2009, the Individual Defendants accepted contributions from Plaintiffs even though these Defendants knew that Plaintiffs were making these contributions based on the Individual Defendants' aforementioned representations.

205.   As a result of the Individual Defendants' conspiracy to defraud, Plaintiffs were damaged in an amount to be established at trial, but not less than amounts they contributed, plus 10% interest from the date Plaintiffs' payments were made.

206.   In doing the acts alleged, the Individual Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiffs and therefore Plaintiffs are entitled to punitive damages in an amount according to proof at the time of trial.   Absent punitive damages, the Individual Defendants will have no disincentive from continuing to engage in their oppressive, fraudulent and malicious conduct.

### THIRD CAUSE OF ACTION FOR RICO
#### Conduct and Participation in a RICO Enterprise
#### through a Pattern of Racketeering Activity:
#### 18 U.S.C. §§ 1961(5), 1962(c)
#### [Against all Individual Defendants and DOES 1-10]

207.    Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

208.    The third and fourth causes of action are civil actions for RICO remedies authorized by 18 U.S.C. 1961 et seq.; for declaratory relief; for actual, consequential and exemplary damages; and for all other relief which this Court deems just and proper under all circumstances which have occasioned these causes of action.  See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO").

209.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized below are to be liberally construed by this Court even though a liberal construction rule was never codified in Title 18 of the United States Code.

210.    Section 1962 of Title 18 of the United States Code, The Racketeer Influenced and Corrupt Organizations Act, (RICO) prohibits engaging in a pattern of racketeering activity.

211.    Under 18 U.S.C. section 1961 (1)(B), "racketeering activity" expressly includes any act which is indictable under 18 U.S.C. sections 1341 (mail fraud), 1343 (wire fraud) and 1344(2) (bank fraud).

212.    Specifically, it is indictable for anyone to use:

{00037480.DOC}

(1)     the mails or wires to advance or conceal a scheme to defraud under 18
        U.S.C., sections 1341, 1343; or

(2)     a scheme to defraud that enables the perpetrator to obtain any funds
        under the custody or control of a bank under 18 U.S.C. section 1344(2).

213.   The primary cause of the third and fourth causes of action is a widespread criminal enterprise where the RICO Defendants (i.e., the Individual Defendants and DOES 1-10) engaged in a pattern of racketeering activity across State lines, and a conspiracy to engage in racketeering activity, involving multiple RICO predicate acts during the past ten (10) calendar years.

214.   The predicate acts cluster around the RICO Defendants' use of (1) the mails and wires to advance and conceal their scheme to defraud Plaintiffs (and other contributors) into making contributions to entities in NITHYANANDA ORGANIZATION and (2) a scheme to defraud that enables the perpetrators to obtain funds under the custody or control of banks and other financial institutions.

215.   Since 2005, the RICO Defendants associated together and used their positions within various alter ego entities to use (1) the mails (interstate or intrastate) and wires (e.g., e-mail, Internet chat, telephone, wire transfer, etc.) to advance and conceal their scheme to defraud Plaintiffs--and many others--out of millions of dollars by providing false information (and concealing material facts) about Mr. NITHYANANDA's qualifications to handle large contributions, the entities within

the ORGANIZATION's operation as a non-profit in compliance with Section 501(c) requirements, and how contributors' money would be utilized to benefit entities within the ORGANIZATION, thereby inducing Plaintiffs--and other contributors--to contribute large sums of money based on that dishonest information and (2) a scheme to defraud that enables the perpetrators to obtain funds under the custody or control of a financial institution (e.g., a bank).

216.   Specifically,

    (a)   Mr. NITHYANANDA used his position as the Leader and/or Manager and/or employee of the entities in the ORGANIZATION and all of the inter-related alter ego entities identified in Paragraph 33;

    (b)   Defendant SIVA used his positions as an employee and/or Manager of Nithyananda Governing Body, Ananda Yoga, Nithyananda Dhyanapeetam OK and Nithyananda Investments;

    (c)   Defendant GOPAL used his position as an employee and/or Manager of Nithyananda University, Nithyananda Dhyanapeetam WA, Nithyananda TX, NTHLEAP and Nithyananda Research.

217.   At various times and places, the RICO Defendants conducted and/or participated, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

218.   During the ten (10) calendar years preceding the date of the filing of this Complaint, the RICO Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(5), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

219.   The RICO Defendants committed two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing, specific threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c).

220.   The RICO Defendants violated 18 U.S.C. sections 1341 and 1343 by using the mails and wires to advance, conceal and further their scheme to defraud Plaintiffs. Specifically, to induce Plaintiffs Dr. Shinde, Mr. Bhutada, the Bhutada Family Foundation, Dr. Carman, Mr. Tayi, Mr. Dalal and Dr. Bhat into making large contributions to the entities within the NITHYANANDA ORGANIZATION, the RICO Defendants made misrepresentations and (omitted material facts) about (1) the creation of a University on the Montclair Property, (2) Mr. NITHYANADA's qualifications to handle or control large contributions, and (3) the operation of the entities within NITHYANANDA ORGANIZATION as nonprofits in compliance with Section 501(c).  The RICO Defendants used the mails and wires to advance and conceal their scheme to defraud Plaintiffs and other contributors as follows:

{00037480.DOC}

(a) The RICO Defendants' misrepresentations and omissions of material facts made to Plaintiffs caused wire transfers involving financial institutions insured by the Federal Deposit Insurance Corporation (FDIC). There were at least twenty (20) electronic wire transfers across state lines to transfer funds from Plaintiffs' bank accounts into bank accounts of entities within NITHYANANDA ORGANIZATION;

(b) On April 28, 2007, the RICO Defendants utilized electronic communications over state lines--via Yahoo Messenger--to participate in a chat meeting with potential volunteers and contributors across the United States and India about fundraising for the entities within NITHYANANDA ORGANIZATION;

(c) On August 1, 2009, RICO Defendant SIVA sent an electronic e-mail communication across state lines to Plaintiffs and other potential contributors about fundraising for the entities within NITHYANADA ORGANIZATION, urging them to "visit Dhyanapeetam website;"

(d) On August 3, 2009, RICO Defendant SIVA sent Plaintiffs and other potential contributors an electronic e-mail across state lines which attached a spreadsheet, indicating the fundraising requirements for the entities within NITHYANANDA ORGANIZATION was $45 million;

(e) On August 4, 11 and 18, 2009, each of the RICO Defendants participated in a nationwide and international telephonic conference call about fundraising for the entities within NITHYANANDA ORGANIZATION;

(f) On August 6, 2009, RICO Defendant SIVA sent Plaintiffs and other potential contributors an electronic e-mail communication across state lines asking them to identify other potential contributors;

(g) On August 8, 2009, RICO Defendant SIVA sent an electronic e-mail communication across state lines to Plaintiffs and other potential contributors, attaching an electronic link to a 150-page report about the entities within NITHYANANDA ORGANIZATION;

(h) On April 13, 2010, RICO Defendant GOPAL sent an e-mail communication across state lines to the other RICO Defendants about the structure, directors and risks of their agreement to destroy evidence and strip the assets from the entities within Nithyananda Organization in order to avoid returning Plaintiffs' contributions and paying other liabilities;

(i) On April 15, 2010, RICO Defendant GOPAL sent an electronic e-mail communication across state lines to personnel running entities within NITHYANANDA ORGANIZATION requesting them to send all of the

other RICO Defendants the plan for the ORGANIAZATION's management changes which was part of the RICO Defendants' agreement to destroy evidence and strip the assets from the entities within NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities;

(j)   On April 16, 2010, Defendant GOPAL received an electronic e-mail communication across state lines highlighting the RICO Defendants' scheme to strip and re-distribute the assets of NITHYANANDA ORGANIZATION which was part of their agreement to destroy evidence and strip the assets from the entities in NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities;

(k)   On information and belief, it is alleged that in April 2010, RICO Defendant GOPAL (via an interstate wire communication) updated "other people in India such as Ayya and Dayamayi," about the RICO Defendants' agreement to destroy evidence and strip the assets from the entities in NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities;

(l)   On April 17, 2010, the RICO Defendants sent and/or received an electronic e-mail communication across state lines setting forth the

RICO Defendants' agreement to destroy evidence and strip the assets from the entities within NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities ("the April 17, 2010 e-mail);

(m)   The April 17, 2010 e-mail was sent across state lines twice and received twice by RICO Defendants SIVA and GOPAL;

(n)   On September 17, 2010, an e-mail was sent across state lines to RICO Defendant SIVA about reviewing the analysis "for different funding options" for the RICO Defendants' agreement to destroy evidence and strip the assets from the entities within NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities;

(o)   From December 2007 through February 2009, RICO Defendant Mr. NITYANNANDA controlled the entities within NITHYANANDA ORGANIZATION that were located in the United States from India utilizing international wires many more than two times.  To carry out their plan to destroy evidence and strip the assets from the entities in NITHYANANDA ORGANIZATION in order to avoid returning Plaintiffs' contributions and paying other liabilities, the RICO Defendants used international wires from India to the United States from

{00037480.DOC}

March 2010 through June 2010 to contact Plaintiffs and other contributors in the United States, such as Popatlal Savla, and made false statements about returning their contributions--even though they had no intention of doing so--to induce Plaintiffs and other contributors to forego filing lawsuits against them.

221. The RICO Defendants violated 18 U.S.C. sections 1344(2) by using a scheme to defraud that resulted in Plaintiffs (and other victims) authorizing financial institutions to release funds to entities within NITHYANANDA ORGANIZATION as follows (but not limited to):

    (a)    On October 21, 2007, Plaintiff TAYI (on behalf of his wife) authorized Chase Bank to release $10,001.00;

    (b)    On May 19, 2009, Plaintiff TAYI authorized Chase Bank to release $100,000;

    (c)    On October 11, 2007, Plaintiff DR. SHINDE authorized Countrywide Home Loans to release $50,000;

    (d)    On December 15, 2009, Plaintiff DR. SHINDE authorized a financial institution to release $16,670;

    (e)    On May 19, 2008, Plaintiff DALAL authorized Parsons Federal Credit Union to release $19,900;

{00037480.DOC}

(f)  In September 2005, Plaintiff BHUTADA authorized a financial institution to release $10,000;

(g)  In October 2005, Plaintiff BHUTADA authorized a financial institution to release $5,000;

(h)  In December 2005, Plaintiff BHUTADA authorized a financial institution to release $10,000;

(i)  On June 1, 2007, Plaintiff BHUTADA authorized a financial institution to release $6,100;

(j)  On October 14, 2007, Plaintiff BHUTADA authorized a financial institution to release 250,000;

(k)  On January 23, 2008, Plaintiff BHUTADA authorized a financial institution to release $67,001;

(l)  Beginning in 2007, Plaintiff CARMAN authorized a financial institution to release $1008 for twenty-four consecutive months;

(m)  On March 30, 2007, Plaintiff CARMAN authorized Wells Fargo Bank to release $5,000;

(n)  On May 22, 2007, Plaintiff CARMAN authorized Wells Fargo Bank to release $5,000;

(o)  On June 15, 2007, Plaintiff CARMAN authorized Wells Fargo Bank to release $5,000;

{00037480.DOC}

(p)   On July 1, 2007, Plaintiff CARMAN authorized Wells Fargo Bank to release $5,000;

(q)   On May 4, 2009, Plaintiff CARMAN authorized Wells Fargo Bank to release $3,000;

(r)   On May 22, 2009, Plaintiff CARMAN authorized Wells Fargo Bank to release $3,000;

(s)   On November 1, 2007, DR. BHAT authorized a financial institution to release $50,001;

(t)   On January 3, 2007, DR. BHAT authorized a financial institution to release $50,001.

222.   The RICO Defendants engaged in a pattern of activity, posing a threat of continued activity, because their actions were part of a pattern of similar acts, which were committed against contributors. Given the nature of the enterprise, i.e., use of the mails and wires to advance, conceal and further a scheme to defraud individuals into authorizing financial institutions to release funds to entities in NITHYANANDA ORGANIZATION, the RICO offenses will likely repeat into the future.

223.   The RICO Defendants' misconduct was not an isolated incident because it covers a span of years and these Defendants engaged in a long-term, on-going scheme to defraud individuals into making contributions to entities in NITHYANANDA ORGANIZATION and therefore acted with a common purpose

{00037480.DOC}

and had sufficient organization and continuity to constitute an enterprise under RICO.

224.   The RICO Defendants' conduct constitutes a "pattern of racketeering activity" under 18 U.S.C., section 1961(5) due to these Defendants continuous and ongoing use of the mails and wires to advance, conceal and further their scheme to defraud contributors into authorizing banks to release funds to entities in NITHYANANDA ORGANIZATION and therefore manifested continuity and relatedness involving more than two acts in violation of 18 U.S.C., sections 1341, 1343 and 1344(2).

225.   Plaintiffs have injury in fact arising from the RICO Defendants' racketeering activity because Plaintiffs' injuries were caused by the predicate acts (i.e., use of the mail and wires to defraud them into authorizing financial institutions to release funds to entities in NITHYANANDA ORGANIZATION) and therefore the damages Plaintiffs suffered were proximately caused by these Defendants' racketeering activity.

226.   Plaintiffs' loss of money was an injury to "Property" within the meaning of RICO because the asserted RICO violations were the legal, and proximate cause of Plaintiffs' injuries, as well as the logical, and but for, cause.

227.   Plaintiffs sustained a cognizable and quantifiable injury to Property. Specifically, Plaintiffs lost the money they contributed to NITHYANANDA ORGANIZATION, plus 10% interest since the dates of their payments.

228.   The RICO Defendants should be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) and from all other violation(s) of applicable state and federal laws.

229.   Judgment should be entered for Plaintiffs and against the RICO Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c), according to the best available proof.

230.   The RICO Defendants should pay to Plaintiffs treble damages for all damages they sustained as a result of the RICO Defendants' violations of 18 U.S.C. 1962(c), according to the best available proof.

231.   The RICO Defendants should pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all judicial and non-judicial enforcement and all reasonable counsel's fees.

232.   All damages caused by the RICO Defendants, and all gains, profits, and advantages derived by them, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) and from all other violation(s) of applicable state and federal law(s), should be deemed to be held in constructive trust for the benefit of Plaintiffs.

## FOURTH CAUSE OF ACTION
### Conspiracy to Engage in a Pattern of Racketeering Activity:
### 18 U.S.C. §§ 1961(5), 1962(d)
### [Against All Individual Defendants and DOES 1-10]

233.   Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

{00037480.DOC}

234.   At various times and places, each of the Individual Defendants ("the RICO Conspiracy Defendants") conspired to conduct and participate in a RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(d).   The purpose of the conspiracy was to facilitate commission of a crime (the use of the mails and wires to defraud contributors into authorizing financial institutions to release funds to entities within NITHYANANDA ORGANIZATION in violation of 18 U.S.C. sections 1341, 1343 and 1344(2).

235.   During the ten (10) calendar years preceding February 28, 2013, the RICO Conspiracy Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(5), and did so in violation of the RICO law at 18 U.S.C. 1962(d) (Prohibited activities).

236.   The RICO Conspiracy Defendants conspired to commit (and committed) two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing, specific threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(d).

237. As set forth in paragraphs 210-224, the RICO Conspiracy Defendants conspired to violate and violated 18 U.S.C. sections 1341, 1343 and 1344(2) by using the mail and wires to advance, conceal and further their scheme to defraud Plaintiffs into

{00037480.DOC}

authorizing financial institutions to release funds to entities in NITHYANANDA ORGANIZATION.

238.   The RICO conspiracy Defendants engaged in a pattern of activity, posing a threat of continued activity because their actions were part of a pattern of similar acts, which were committed against other individuals who contribute money to entities in NITHYANANDA ORGANIZATION.  Given the nature of the enterprise, i.e., use of the mail and wires to advance, conceal and further a scheme to defraud individuals into authorizing financial institutions to release funds to entities in NITHYANANDA ORGANIZATION, the RICO offenses will likely repeat into the future.

239.   The RICO conspiracy Defendants' conduct constitutes a "pattern of racketeering activity" under 18 U.S.C., section 1961(5) due to these Defendants ongoing use of the mail and wires to advance their scheme to defraud Plaintiffs and contributors into authorizing financial institutions to release funds to entities in NITHYANANDA ORGANIZATION and therefore manifested continuity and relatedness involving more than two acts in violation of 18 U.S.C., sections 1341, 1343 and 1344(2).

240.   Plaintiffs' loss of money in the form of contributions based on fraud and deceit was an injury to "Property" within the meaning of RICO because the asserted RICO violations were the legal, or proximate, cause of Plaintiffs' injuries, as well as a logical, and but for, cause.

{00037480.DOC}

241.   Plaintiffs sustained a cognizable and quantifiable injury to Property, not personal injuries (i.e., loss of the money contributed, plus 10% interest since the date of their payments).

242.   The RICO Conspiracy Defendants should be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) and from all other violation(s) of applicable state and federal laws.

243.   Judgment should be entered for Plaintiffs and against the RICO Conspiracy Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d), according to the best available proof.

244.   The RICO Conspiracy Defendants should pay to Plaintiffs treble damages, under authority of 18 U.S.C. 1964(d), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d), according to the best available proof.

245.   The RICO Conspiracy Defendants should pay to Plaintiffs treble damages for all damages they sustained as a result of these Defendants' several violations of 18 U.S.C. 1962(d), according to the best available proof.

246.   The RICO Conspiracy Defendants should pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees.

{00037480.DOC}

247.   All damages caused by the RICO Conspiracy Defendants and all gains, profits, and advantages derived by them, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) and from all other violation(s) of applicable state and federal law(s), should be deemed to be held in constructive trust for the benefit of Plaintiffs.

**FIFTH CAUSE OF ACTION
UNFAIR BUSINESS PRACTICES:
CALIFORNIA BUSINESS AND PROFESSIONS CODE
SECTIONS 17200 ET SEQ.
[AGAINST ALL DEFENDANTS]**

248.   Plaintiffs re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

249.   Each of the Defendants' acts violated California's Unfair Competition Law, Business and Professions Code section 17200 et seq. ("UCL") by engaging in unlawful, and/or unfair and/or fraudulent conduct.   The UCL provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice," including acts of intentional misrepresentation or concealment of material facts.

250.   Each of the Defendants' conduct violated the unlawful prong of the UCL because Defendants violated Section 501(c); 18 U.S.C. secs. 1341 (mail fraud), 1343 (wire fraud), 1344(2) (bank fraud) 1961(5) and 1962(c) and (d) (civil RICO); California Civil Code, Sections 1709, 2223, 2224 (California's Fraudulent Business

Practices Statute; California Civil Code, Section 1710 (same)); California Penal Code, Section 484 (Same).

251.   Each of the Defendants violated the fraudulent and unfair prongs of the UCL because they intentionally defrauded Plaintiffs.

252.   As a result, Plaintiffs and were denied vested Property rights by each of the Defendants.

253.   Each of the Defendants generated--and continue to generate--gains as a direct result of its unfair, unlawful and fraudulent business practices.   Plaintiffs and are therefore entitled to (1) restitution and/or restitutionary disgorgement of any and ill-gotten gains obtained by each of the Defendants as a result of their UCL violations, (2) preliminary and permanent injunctive relief under California Business and Professions Code, section 17200 et seq.; and (3) reasonable attorney fees under Code of Civil Procedure, section 1021.5, and any other applicable statutory provision.

## PRAYER

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, according to proof, as follows:

a.      For general, special and non-pecuniary damages;

b.      For interest at the maximum legal rate;

c.      For the amount of treble (triple) damages, with interest, under RICO from the Individual Defendants;

d.    For compensatory damages arising out of mental anguish, emotional distress, personal humiliation, damage to Plaintiffs' reputation and other non-economic harms resulting from Defendants' intentional conduct;

e.    For reasonable attorneys' fees pursuant to Code of Civil Procedure, section 1021.5; RICO, and any other applicable statutory provision;

f.    For injunctive and restitutionary relief and other equitable relief such as a receiver, constructive trust and unjust enrichment under RICO and the UCL;

g.    For exemplary and punitive damages; and

h.    For such other and further relief as the Court may deem just and proper.

Dated: January 16, 2014                    SHENOI KOES LLP

By: _____
                    Allan A. Shenoi
                    For Plaintiffs

{00037480.DOC}

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all claims so triable.

Dated: January 16, 2014                          SHENOI KOES LLP


By: _____
Allan A. Shenoi
For Plaintiffs

{00037480.DOC}

# EXHIBIT A

INTENTIONALLY LEFT BLANK

# EXHIBIT B



# Nithyananda Foundation

Dear Sirs,

Sub: Grant Request

Nithyananda Foundation is a non profit charitable organization described under section 501(c)(3) of the Internal Revenue Code. We are currently seeking a grant for $250,000. The purpose of the grant is to pursue our charitable activities in furtherance of our 501c3 tax exempt status. All donations are 100% tax deductible to the donor.

We seek your kind support for our charitable causes.

Thanking You,

Yours truly,

Rajesh Krishnan

Chief Financial Officer

Phone: 206 223 4146

Ext. B

P. 1 of 1

928 Huntington Drive, Duarte, CA 91010

# EXHIBIT C



**128**

Re: Mission Vision Fundraiser Strategy Plan - First Conference Call @ 7.30pm PST on Aug 4, 2009

Thursday, August 6, 2009 11:26 AM

From: [illegible email]

To: [multiple illegible email addresses]

CASE NO. S_M_CV_1361_SVW
Saul
vs Nithyananda
PLAINTIFF'S EXHIBIT ___128___
DATE _____ IDEN.
DATE _____ EVID.
BY _____
AO 386

Nithyanandam

Dear All

Thanks for participating in the first conference call for Mission Vision fundraiser. We spent most of the call discussing about the following

1 Total project cost is $45 million - $22 Million for Bidadi infrastructure and $23 Million for 108 Nithyananda Vidyalayas. See mission vision link here for more details

2 Los Angeles Mission Vision fundraiser team met and brainstormed on names of potential donors. Just like programs LA team felt that charity starts at home and when core team members/devotees they can speak with confidence and inspire people

3 Team went through details of how LA went about identifying the potential donors

4 Overall process is very similar to building tower in that we need to continuously talk to everyone. Also donors may be high net worth individuals but there are also those who have been deeply touched by Swamiji and would give disproportionately high donations.

As a way forward we need to pursue the following and be prepared to report the following at the next conference call

1 Each city will brainstorm around identifying potential donors. In doing so we will list the core team members/devotees also who have been touched by the master and feel the gratitude to get involved. These people tend to help us disproportionately

2 In addition each city fundraiser team will meet and brainstorm around the list of people. In doing so it is very likely the people will know high potential individuals who may not necessarily be in that city. We should list all high potential candidates. In identifying these individuals please also consider several dimensions, including

    a. Those who are high net worth individuals

    b. Those who are known to be philanthropic in general. Consider those who have given to causes such as temples, educational institutions, social services, etc

    c. Please list the key contacts for the individuals

3 I would recommend each city to extend the fundraiser team to

Eth C
r I a( )

00046
SAV
128

include individuals who are connected and who may have social
networks. Typically a core team of 5-7 individuals in each city will
be important to ensure we have a good starting database of people.
Please forward me the list of individual teams and the core team
members who you would like to participate in the weekly calls.
4. Please try and organize fundraiser meetings in each of your cities
this weekend and forward me the results from the fundraiser by Monday
August 10, 2009
5. Sachit will also forward a 150 page report on what mission has
accomplished in the first 5 years. This will be a very useful tool
to educate ourselves and inspire people.

The next fundraiser conference call will be at 7:30 pm PST on Tuesday
August 11, 2009. The call in numbers are as follows:
Conference Dial in Number (712) 432-0111
Participant Access Code 717114#

Let us move this forward expeditiously. I am looking forward to
active participation from the entire team. This is an exciting time
to be involved with the creation of history on
planet earth! I see the following objectives for the upcoming call:
1. Review the database of potential donor targets by city - Week 2
2. Consolidate database of contacts and ensure removal of duplicates
agree upon who is contacting whom and contact process - Week 2
3. Develop plans of approach and formats for initial meetings in each
city including calendars for visits and one on one meetings. Commence
heating tower type contacts process. Report results from initial
contacts to share with group as to what worked and what did not - Week
3
4. Schedule meetings in each city for team to meet with individuals
/High potential contacts. Team consisting of Sri Sachitananda, Sri
Sahajananda, Maheshwara. Member from city fundraiser team to commence
travels to each city. Travels can start from September 19/20 weekend
Sri Sachitananda to be available for this work on a full time basis.

In Nithyananda.
Sri Nithya Sachitananda.

Nithyananda! Watch over 500 video clips on sacred scriptures, life
solutions, meditation and spirituality delivered by living enlightened
master Paramahamsa Nithyananda at www.youtube.com/lifeblissfoundation

Exh C
( ) ( )

00047
AV

# EXHIBIT D





Mission Vision Fundraiser - Mission Accomplishments Documents & Objectives for the Second
Conference Call @ 7 30pm PST on Aug 11, 2009

Saturday, August 8, 2009 5:29 Pm

From  "Nithya Sachidananda" <nithya.sachidananda@gmail.com>

To  "Sri Nithya Bhaktananda" <nithyabhaktananda@gmail.com>, "Sri Nithya Medhananda"
<nithyamedhananda@gmail.com>, "Saroj" <nithyasahajananda@yahoo.com>,
"Kamalata Rambhatla" <nithyamalata@gmail.com>, "Kamala Rambhatla"
<k-mala@gmail.com>, "gopal savla" <gopal.savla@yahoo.com>, "Kalyana Savla"
<ddhsavla@yahoo.com>, "Manohar Shinde" <manohar.shinde@yahoo.com>,
"Bharat G Shah" <brc@bc.com>, "Prakash Mundhe" <prakash.mundhe@gmail.com>, "Pa
Nischalananda" <nischalananda.temple@gmail.com>, "Rai Ramanathan"
<rnat@globalmayers.com>, "Dhanu Patel" <rmaramanathan@yahoo.com>, "Suresh
Kumar" <sureshkumar@yahoo.com>, "Medhanananda Raja"
<nmdhananda.raja@gmail.com>, "Nithamaya Nithyananda"
<nithyananda.vnr@gmail.com>, "sandham@gmail.com" <Sandy Ramanan>,
<adalaram@charter.net>, "Mallikarjun" <Mallikarjun@yahoo.com>,
<balayani@yahoo.com>, "Raj" <raj@bc.com>, <nithyaraj@gmail.com>

Nithyanandam

Dear All

As promised attached please find detailed 150 page document containing
mission accomplishments in the last 5 years.

https://www.yousendit.com/download/YHVpdFPUZdXUiZ7Wwx9PG0

CASE NO  S 11-cv-1209 SVW

         Saula

VS   Nityanda

PLAINTIFF'S EXHIBIT  129

DATE _____ IDEN

DATE _____ EVID

         BY _____

AO 386

Please go through the document in detail so that we can share our
accomplishments and the vision Swamiji laid out. At the next
conference call the coming Wednesday, the plan was to review the
database of contacts in each city including closely connected
devotees, high net worth individuals, those who are sympathetic to
this cause and those who have contributed to charitable causes in the
past. Please take the time from your schedules this weekend to conduct
brainstorming sessions in each of the cities and let us develop the
list. This is the raw material for developing fundraiser plan. In your
brainstorming, please do not restrict your list to only people in your
respective cities. In order to make the brainstorming a fruitful
exercise, please have a reasonable group and identify those folks, who
have good social networks of individuals we are targeting. In LA we
had 7 people who participated in the brainstorming session and it was
effective to have a group to jointly develop the list

The next conference call will be held on Tuesday, August 11, 2009 at
7 30 pm PST. The call in details remain the same are are given below

Conference Dial in Number (712) 432 0111
Participant Access Code 717114#

At coming weeks call we will review database by city. After this
review, the following week would target on operations such as, start
up of healing tower, contacting individuals, making appointments, for
reviewing mission vision, etc

Ex. D
1 lof 1

, Nithyananda,
Sri Nithya Sachidananda

On Sat, Aug 1, 2009 at 1:06 PM, Nithya
Sachidananda <nithya.sachidananda@gmail.com> wrote:
> Nithyanand.ai!
>
> Dear All
>
> I would like to schedule to schedule the first Mission Vision
> fundraising conference call on Tuesday, August 4 at 7.30 pm PST.  The
> call will be 1 hour in duration.  The following is the call in number.
>
> As you know, our beloved Swami announced his vision for the mission
> and several of you were present during this historic announcement.
> Construction, planning and infrastructure activities are now going on
> in full swing in Bidadi.  We now need to step up our work to start
> procuring funds in a timely manner so that we can start various
> projects to meet our 12-12-12 inauguration of "Nithyananda
> Namashivaya."  Those of you who may not have seen the Mission Vision
> brochure, please visit Dhyanapeetam website where you can review the
> mission vision brochure.
>
> As a start the Los Angeles devotees gathered in Maheshwara's place
> last week and started brainstorming session.  We reviewed fundraiser
> commitments and discussed ways to organize ourselves to go forward
> with this work.  For the first conference call, we would like to
> accomplish the following.
>
> 1. Review Mission Vision financial requirements
> 2. Review Mission Vision commitments by city, status of funds raised
> to date, commitments and uncommitted amounts.
> 3. Review funds requirement by quarter from 3rd quarter 2009 onwards
> 4. Los Angeles brainstorming process, identification of target individuals
> 5. Review fundraiser process, fund raising team & organizational issues
> 6. Review Marketing Materials
> 7. Next Meeting Objectives & pre work requirements (brainstorming in
> individual cities prior to next call to develop target individuals)
>
> Here are the conference call in details
> Conference Dial in Number  (712) 432 0111
> Participant Access Code  717114#
>
> Medha Maye, Could you please forward this mail to Sree and Neal in
> Seattle.  I do not have their email IDs
> Ma Nischala, You also had a couple of people who you wanted to join
> this call.  Please forward to them as well
>
> in Nithyananda
> Sri Nithya Sachidananda

00055
SAV

- Watch over 500 video clips on sacred scriptures, life solutions,
- meditation and spirituality delivered by living enlightened master
- Paramahamsa Nithyananda at www.youtube.com/lifeblissfoundation

Nithyanandam! Watch over 500 video clips on sacred scriptures, life
solutions, meditation and spirituality delivered by living enlightened
master Paramahamsa Nithyananda at www.youtube.com/lifeblissfoundation

# EXHIBIT E

# INTENTIONALLY LEFT BLANK

# EXHIBIT F

14

RANK BY SEARCH

Dan S <dans@rankbysearch.com>

# Fwd: Summary of our discussion

Sri Nithya Jyotimayananda <swathya jyothimayananda@gmail.com>                    Sat, Apr 17, 2010 at 6:07
                                                                                                                    PM

To: sachit <nithya sachitananda@gmail.com>, dans@rankbysearch.com, sheckon76@yahoo.com,
nithya dayananda@gmail.com, ma sachit@gmail.com, nithya sadhananda@gmail.com,
nithya ayya@yahoo.co.in, nithya swamananda@mail.templeofdivine.com, Gopal Sheckon <sheckon@hotmail.com>
Cc: Sri Nithya Sahajananda <nithya sahajananda@gmail.com>

Nithyanandam

This is the summary of the discussion with Bhaktaswami over the phone yesterday.

Thanks
Jyothi

---------- Forwarded message ----------
From: Sri Nithya Jyotimayananda <swathya jyothimayananda@gmail.com>
Date: Sat Apr 17 2010 at 7:44:54
Subject: Summary of our discussion
To: Gopal Sheckon <sheckon@hotmail.com>
Cc: Sri Nithya Sahajananda <nithya sahajananda@gmail.com>

Dear Bhaktaswami

Nithyanandam

Here is the summary of our discussion yesterday. I thought this will help you discuss this with others.

- Bhaktaswami mentioned Ryori's earlier mail on the dissolution and distribution plan was very
  clear and unambiguous. He said there is an agreement in principle on the plan. However will
  provide further comments on Monday. He will also update other people in India, such as
  Ayya and Dayamaya

- Bhaktaswami enquired about the Temple closing and Sahaj explained and both discussed the
  issue

- Legal scenario was discussed. Following are the main points
    - Our attorneys have been following the case from the very beginning and they
      have good knowledge of all the facts
    - Dissolution of the entities was recommended as the cleanest option with the
      least risk. The best way recommended was to start on a clean slate and it
      involves the least risk against any lawsuits. Our attorneys has specifically stated

Exh. F
p. 1 of 6

quoting case studies of courts not allowing cases against organizations that have been dissolved

- For protecting directors and officers and possibly volunteers, we will have had coverage insurance for 6 years after the dissolution
- The insurance has two kinds of coverage. Incident based coverage and Claims made coverage. Our D&O insurance is claims made and we will get such a coverage as had coverage for 6 years after the entities are dissolved to cover all the directors and officers even after the entities are dissolved
- There have been multiple threats of lawsuits in person, in email and over the phone multiple times. Also in private conversations, we have heard about various threats of lawsuits as well. We have communicated these concerns to our attorneys as well. They have been guiding us on the course of action in each of these steps
- There is a complaint filed with the Attorney General's office in California by Doug McKellar on Swampi alleging various acts of misconduct and irregularities. The Attorney General's office refuses to disclose the details of the complaint nor the investigation process. This is an unknown that is bound to haunt the organization
- Complaints are known to have been made to the Attorney General's office in the State of Washington. This is alleged to have been made by someone in high position in Microsoft and may be a few others. Our Attorneys have been asked to find out details
- Complaints are also alleged to have been made to the Attorney General's office in the State of Texas. The nature of the complaint is unknown at this point of time. Our Attorneys have been asked to find out details
- The threat of sexual harassment lawsuits exist in the US. There are people who have expressed such concerns of such incidents happening to them. The threat is potential is greater due to the statutory nature of the claim. There are two kinds of legal claims
  - Tort claim. This claim is due to a situation not mandated by law. For e.g. the lady saying McDonalds didn't say coffee is hot is a tort claim. McDonalds was not required by law to say the coffee is hot
  - A Statutory claim. This is a claim against violation of a protection offered by the law. For e.g. in a teacher student relationship, in the scenario of a sexual relationship between a student and a teacher, who are both adults, the student can potentially argue in court that the sexual incident was a rape due the statutory obligation on part of the teacher and the organization for the student to be protected. A statutory claim has a higher chance of succeeding in court
- There are a number of known threats as well as unknown threats. We are getting know more day by day

Bhaktaswami will get back on the plan with further comments on Monday

Thanks,
Jyoti

Ex - F
p 2 of 6

001

## DistributionPlan

| Entity | Activity | State | 501(c)(3) | Bank | Assets | Liabilities & Known Expenses | Samoan Donors Support | Cash Distribution Plan | Asset Distribution Plan |
|---|---|---|---|---|---|---|---|---|---|
| Maliyamoa Foundation | Owns LA & Columbus temple buildings that conducted Swamp programs | OK CA OH | 501(c)(3) with Church status | $18,000 | LA temple bldg & Columbus temple bldg | ($1,700,000) | $0 | Legal expenses & bills for the new Los Angeles temple community temple entity | A temple bldg for new A community temple entity Columbus temple bldg for new A columbus community temple entity |
| Life Bliss Foundation | Conducts Swamp programs and other meditation workshops | CA | 501(c)(3) with Church status | $800,000 | 9 cars and 1 truck | ($50,000) | $0 | $78,000 for the restoration Mortgage $700,000 restoration fee legal expenses Rest for the new Los Angeles community temple entity | Distribute new A community temple entity for the new LA vehicles and truck transfer vehicles to the new LA community temple entity |
| Maliyamoa Olympus temple & Cultural Center (NOTCC) | | Maui CA | 501(c)(3) with Church status | $400,000 | 7 houses in LA | ($45,000) | $0 | Legal expenses & bills Any remaining amount to a nonprofit $0 501(c)(3) | Destroy new A community temple entity Sell houses and distribute cash to nonprofit corporate |

ExA. F
P. 3 of 6

| | | | | | | | | 501(c)(3) |
|---|---|---|---|---|---|---|---|---|
| Nithyananda Yoga Foundation | Conducts Yoga Programs & Services | CA | 501(c)(3) | $11,000 | None | | $0 | $0 | Other Nonprofits and Legal Expenses | No non-cash Assets |
| Nithyananda Anna Mandir | Conducts Food Services | CA | 501(c)(3) | $50,000 | None | | $0 | $0 | Legal Expenses & Bills Any remaining amount to a local nonprofit | 501(c)(3) No non-cash Assets |
| Nithyananda Yoga & Meditation University | No Activity Currently | CA | 501(c)(3) with Church status | $0 | None | | $0 | $0 | No Cash Assets | No non-cash Assets |
| NID of Seattle | Runs Seattle Temple | WA | 501(c)(3) with Church status | $10,000 | None | ($60,000) | $0 | Legal Expenses & Bills Any remaining amount to a local nonprofit | 501(c)(3) Devotes to a local nonprofit 501(c)(3) Temple |
| NID of San Jose | Runs San Jose Temple | CA | 501(c)(3) with Church status | $24,000 | None | ($10,000) | $1,500 per month | Legal Expenses & Bills Any remaining amount to the new San Jose Community Temple entity if it get formed Or else to a local San Jose nonprofit 501(c)(3) Temple | Devotes to a local nonprofit 501(c)(3) Temple or Devotes to a local San Jose Community Temple entity |

Ex. F
p. 4 of 6

008

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NO of St Louis | Runs St Louis Temple | MO | 501(c)(3) with Church status | $10,000 and | ($4,000) | $0 501(c)(3) | Legal Expenses & Bills, Any remaining amount to a local nonprofit 501(c)(3) | Desires and and to a local nonprofit 501(c)(3) temple in St Louis |
| NO of Phoenix | Runs Phoenix Temple | AZ | 501(c)(3) with Church status | $5,000 None | ($4,000) | $0 entity | Legal Expenses & Bills, Any remaining amount to the new Phoenix Community Temple entity | Desires to the new local Phoenix Community Temple entity |
| NO of Oklahoma | Runs Oklahoma Temple | OK | 501(c)(3) with Church status | $5,000 None | $0 | $0 entity | Legal Expenses & Bills, Any remaining amount to the new Oklahoma Community Temple entity | Desires to the new local Oklahoma Community Temple entity |
| NO of Houston | No Activity Currently | TX | None | $75,000 None | ($72,000) | $0 501(c)(3) | Legal Expenses & Bills, Any remaining amount to a local nonprofit | No non-cash Assets |
| NO of Columbus | Runs Columbus Temple | OH | 501(c)(3) with Church status | $8,000 None | ($4,000) | $0 amount to | Legal Expenses & Bills, Any remaining amount to | Desires to the new Columbus Community Temple entity |

Exh. F
P 5 of 6

008

| | | | | | | | | a local nonprofit 501(c)(3) | |
| NO of North Carolina | No Activity currently | no | None | | $0 | None | $0 | $0 | No Cash Assets | No Assets |
| NO of New York | No Activity currently | NY | None | | $0 | None | $0 | $0 | No Cash Assets | No Assets |
| | | | | | | | | No Cash Assets | No Assets |

* Liabilities are based on pending payments those brokerage fees and outstanding monthly operational dues

Exh. F
P. 6 of 6

0082
SA